**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **META 1 COIN TRUST,** | § | |
| **ROBERT P. DUNLAP, individually and d/b/a** | § | **Civil Action No.:** |
| **CLEAR INTERNATIONAL TRUST,** | § | |
| **NICOLE BOWDLER, and DAVID A. SCHMIDT,** | § | |
| | § | **FILED UNDER SEAL** |
| **Defendants,** | § | |
| | § | |
| **and** | § | |
| | § | |
| **PRAMANA CAPITAL, INC., and** | § | |
| **PETER K. SHAMOUN a/k/a PETER K. SHAMOON,** | § | |
| | § | |
| **Relief Defendants.** | § | |
| | § | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission" or "SEC"), for its

Complaint against Defendants Meta 1 Coin Trust ("Meta1"), Robert P. Dunlap, individually and

d/b/a Clear International Trust ("Dunlap"), Nicole Bowdler ("Bowdler"), David "Dave" A.

Schmidt ("Schmidt") (together, "Defendants") and Pramana Capital, Inc. ("Pramana") and Peter

K. Shamoun a/k/a Peter K. Shamoon ("Shamoon") (together, "Relief Defendants"), alleges:

## SUMMARY

1.     This is an emergency action to stop Dunlap, his girlfriend, Bowdler, and Schmidt,

a former Washington state senator, from continuing to fraudulently solicit investors in an

unregistered securities offering of a purported digital currency called the Meta 1 Coin (the

"Coin"). The Defendants have variously claimed that the Coin is backed by a $1 billion art

collection and/or $2 billion of gold.  In reality, the Coin is backed by nothing.

2.      From April 2018 through the present (the "relevant period"), Defendants, both directly and through entities they control, have raised at least $4.38 million from over 150 investors throughout the United States and internationally, through deceptive acts and materially false and misleading statements and omissions.  For example, Defendants have falsely stated that: (a) investors were, in fact, purchasing asset-backed digital coins; (b) Meta1 owned $1 billion in art insured against loss by a surety bond, and later, that Meta1 owned $2 billion in gold assets; (c) KPMG, one of the largest independent financial audit firms in the world, was auditing Meta1's gold assets; (d) Meta1 formed its own investment bank and developed its own digital currency exchange; (e) the Coin is safe and risk-free and will never lose value; (f) an initial public offering of the Coin ("ICO") on its own exchange was imminent; and (g) each Coin, sold for either $22.22 or $44.44 would in two years be worth $50,000—up to a 224,923% return—as a "very conservative value."

3.      Defendants enticed investors with the allure of a cryptocurrency, but the securities offering is nothing but a vehicle to steal investors' money.  In reality, as Defendants knew, or were severely reckless in not knowing, each of the statements listed above was and is false. There is no reasonable basis to project any investment returns—much less a 224,923% return— given that, as Defendants knew or were severely reckless in not knowing, victims were simply investing in a scam.  And although Defendants assured investors that KPMG verified and affirmed Meta1's gold valuations to bolster their claims that the Coin was safe and risk-free, those assurances were lies.  KPMG confirmed that it has never performed any audit services for Meta1, or anyone associated with Meta1 or any of the Defendants.

4.      Defendants made the misstatements variously on the Meta1 website—including in

a "whitepaper" issued by Meta1 in connection with the offer and sale of its securities during the "pre-ICO launch"—as well as during in-person presentations and "workshops" held across the country and internationally, in periodic email newsletters, on websites related to the Defendants, and on Internet radio broadcasts accessible worldwide on numerous online fora such as BlogTalkRadio, YouTube, and Facebook.

5.     The offers and sales of these purported "Coins" are (and were) illegal offerings of securities for which no registration statement has been filed, and as to which no exemption from registration is or was available (the "Coin Offerings").  The Coin Offerings are (and were) conducted through general solicitations made using statements posted on the Internet and distributed throughout the world, including in the United States and in this District.  Defendants took no steps to determine whether investors were accredited or sophisticated, and, in fact, disregarded evidence that they were neither.

6.     Relief Defendants Pramana and Shamoon each received proceeds of the fraud and have no legitimate claim to those ill-gotten investor funds.

7.     The scheme is ongoing, and investor funds are at risk.  Meta1 continues to solicit new investors, and Defendants are actively promoting the Coin and falsely stating that an ICO is imminent.

**VIOLATIONS AND RELIEF REQUESTED**

8.     By committing the acts alleged in this Complaint, the Defendants directly and indirectly engaged in, and unless restrained and enjoined by the Court will continue to engage in, acts, transactions, practices, and courses of business that violate the anti-fraud and securities registration provisions of the federal securities laws, specifically Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and (c), 77q(a)] and Section

10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

9.      The SEC seeks permanent injunctions, disgorgement plus prejudgment interest, and civil penalties against each Defendant, and all other equitable and ancillary relief to which the Court determines the Commission is entitled.  Additionally, the Commission seeks disgorgement from the Relief Defendants—persons or entities to which Defendants diverted ill-gotten investor funds—regarding all funds derived, directly or indirectly, from the Defendants' fraudulent conduct.

## JURISDICTION AND VENUE

10.      The Court has jurisdiction over this action under Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. § 77t(d) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. § 78u(d), 78u(e) and 78(aa)].

11.      Venue is proper in this Court pursuant to Section 22(a) of the Securities Act and Section 27 of the Exchange Act [15 U.S.C. §§ 77v(a) and 78aa].  Certain of the transactions, acts, practices, and courses of business described herein occurred within the Western District of Texas.  For example, Dunlap and Bowdler began the fraud while living in Fredericksburg, Texas, where they offered and sold unregistered securities to investors and operated the scheme for over a year; sold the Coin to investors who live within this judicial district; and falsely claimed ownership of an art collection that was, at all times, located in Fredericksburg.

12.      In connection with the transactions, acts, practices, and courses of business described in this Complaint, the Defendants, directly and indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the means and instruments of transportation or communication in interstate commerce.

## PARTIES

**A.    Defendants**

13.    **Meta1** is an unincorporated entity purporting to be an irrevocable trust with Dunlap and Bowdler as trustees.  From at least April 2018 to the present, Meta1 has offered and sold securities in the form of the Coin.  Meta1 is not registered with the Commission in any capacity, and has not filed a registration statement in connection with the offering of any securities.

14.    **Dunlap d/b/a Clear International Trust ("Clear")**, age 48, currently resides in Boca Raton, Florida.  Dunlap created, owns, and controls Meta1.  Dunlap is responsible for the content on Meta1's website and in its offering documents.  Dunlap now, and during the relevant period, solicits investors in person and via Skype in nationwide and international "workshops" and via regular live Internet radio broadcasts.  Dunlap has never been registered with the Commission in any capacity, and has never been licensed to offer or sell securities.  Clear is another purported trust owned and controlled by Dunlap and Bowdler.  Clear has at least two bank accounts where investor funds were deposited: one at Bank of America, and one at Morgan Stanley Smith Barney (for which both Dunlap and Bowdler are signatories).

15.    **Bowdler**, age 39, currently resides with Dunlap in Boca Raton, Florida.  She is Meta1's purported "Trustee and Art Acquisitions & Forensics Director of Business Development."  Bowdler claims to use her "psychic expertise" to provide investment guidance to listeners who share her beliefs, encouraging them to invest in Meta1.  In particular, Bowdler claims to be an "Earth Angel incarnated to help humanity," and purports to regularly channel and commune with angels, including the mythical angel, Metatron, who frequently teaches her about

"the realities of our world." Bowdler is not, and has never been, registered with the Commission in any capacity and has never been licensed to offer or sell securities.

16. **Schmidt**, age 55, currently resides in Boca Raton, Florida and, during the relevant period, was a member of Meta1's "board." Schmidt served in the Washington State Legislature from 1994 to 2006, first as a state representative and then as a state senator. On March 20, 2012, the Public Disclosure Commission of the State of Washington found (and Schmidt stipulated) that Schmidt improperly reimbursed himself from campaign funds for wages he claimed to have lost and improperly used campaign funds for personal use, among other findings. Schmidt was also ordered to pay a civil penalty of $10,000. *See* Final Order, *In the Matter of Enforcement Action Against: David Schmidt and 2006 Schmidt Campaign),* PDC Case No. 11-018, available at https://pdc-case-tracking.s3-us-gov-west-1.amazonaws.com/2252/11018.Order.pdf. Schmidt publishes content regarding Meta1 on his websites, www.thesedonaconnection.com, https://thecosmicconnections.wordpress.com, and www.thesedonaconnectionfoundation.com. Schmidt also hosts a weekly online radio talk show called "Cosmic Connections" (formerly known as "The Sedona Connection"), which is typically posted to one or more of his websites, his YouTube channel (available at https://www.youtube.com/user/repdas/featured), and to his Facebook page, where he discusses the Coin Offering and solicits investments in Meta1 (the "Radio Shows") (available at https://www.blogtalkradio.com/the-sedona-connection). Schmidt also drafts and disseminates a periodic email newsletter to investors and potential investors in Meta1 (the "Newsletter"). Schmidt also runs a series of conferences and workshops in various cities nationwide where he and Dunlap pitch the Coin Offering (the "Workshops"). Schmidt has never been registered with the Commission in any capacity and has never been licensed to offer or sell securities.

B.     **Relief Defendants**

17.     **Pramana** is an Illinois shell corporation, not in good standing, with its principal place of business listed as a private residence in Saint Charles, Illinois. Pramana is owned and controlled by Shamoon, its sole officer. Pramana received at least $1 million in investor funds from Dunlap and Clear International Trust. Pramana has never been registered with the Commission in any capacity.

18.     **Shamoon,** age 52, currently resides in Saint Charles, Illinois and is Pramana's sole owner and officer. In April 2019, Shamoon purported to form a trust named "Meta 1 Coin Trust" in Saint Charles, Illinois. In December 2019, Shamoon opened a bank account at BMO Harris Bank under the name "Meta 1 Coin Trust," and is the sole signatory ("BMO Harris Account"). Shamoon has been depositing new investor funds in the BMO Harris Account. Shamoon used over $215,000 in investor funds from the BMO Harris Account to purchase a Ferrari. Shamoon has never been registered with the Commission in any capacity and holds no securities licenses.

## FACTUAL ALLEGATIONS

A.     **Overview of the Fraudulent Scheme and the Defendants' Material Misstatements.**

19.     In or around April 2018, Dunlap and Bowdler began this fraudulent scheme while living in Fredericksburg, Texas. Schmidt joined the team no later than September 2018, and began extensively marketing the Coin Offering.

20.     Dunlap claimed to have created and developed a new digital currency that he called the "Meta 1 Coin." Dunlap and Bowdler began to solicit investors, telling them that they could get in on the ground floor before the initial public offering of the Coin, or "ICO."

21.     The Coin Offering would allegedly convert "fiat currency" (such as the U.S.

dollar) into "tokenized" currency that, in the case of the Coin, was supposedly backed by hard assets. The hard assets supposedly backing the Coin changed over time. Between approximately April 2018 and March 2019, the Defendants claimed that the Coin was backed by $1 billion in fine art and insured by a $1 billion surety bond. Between approximately April 2019 and November 2019, the Defendants claimed that the Coin was backed by $1 billion in fine art and gold. Since approximately November 2019, the Defendants have claimed that the Coin was backed by $2 billion in gold.

22. During the relevant period, Dunlap and Schmidt told prospective investors that the Coin was a safe investment. They claimed it could never lose its value, and that one Coin, which could be purchased for $22.22 (or $44.44), would be worth as much as $50,000 after the ICO, which was imminent.

23. Dunlap and Schmidt solicited investors using a "whitepaper," which Dunlap drafted and/or copied from publicly available online sources, and updated as the scheme progressed (the "Whitepaper").

24. In general, a "whitepaper" is an informational report used as a marketing tool to educate an audience about a particular issue, or to explain a product, service or technology.

25. By at least August 2018, Dunlap had created Meta1's website, https://meta1.io. The website described Meta1 and claimed that it was not bound by any laws. Specifically, the website noted that Meta1 is "a Private trust operating in a 'Private Jurisdiction'. Meaning [sic] META 1 Coin is not within a State or Federal jurisdiction and not accepting contracts from any such parties. The various federal agencies and their attempts of defaming and stopping the advent of digital assets have no legal bearing on META 1 allowing META 1 to operate without the interference of such agencies."

26.     During the relevant period, the website has prominently featured different versions of the Whitepaper, at least two of which describe the Coin as:

> an asset-backed "Smart" Crypto Currency Secured by Humanity's greatest expressions of Life, by Master artists such as Picasso and Van Gough(sic). META 1 Coin is a coin for Humanity, built on the framework of abundance by smart contracts, unbreachable on the blockchain, ensuring appreciation and never devaluation. META 1 COIN has a Private Bank and Private Exchange ensuring liquidity, security, and unencumbered transactions. META 1 COIN has a Powered Blockchain ensuring high-performance Global transactions called the 'METATRONIC NETWORK.'

### 1. *Meta1 Lied About Owning Art*

27.     Until at least March 2019, the Whitepaper included pictures of fine art that Meta1 claimed it owned and backed the Coin. This is, and has always been, false.

28.     At the outset of the scheme, Dunlap posed as a wealthy banker and signed a contract to purchase 18 pieces of a rare art collection (the "Collection") owned by a Fredericksburg, Texas resident (the "Art Collector"). Notably, the Collection had never been appraised or authenticated, but even the Art Collector valued the *entire* Collection at $100 million. Dunlap, however, never paid for or acquired any of the art.

29.     Nevertheless, to bolster their false claims, Defendants continued to tell investors and potential investors that Meta1 owned the art.

30.     On January 15, 2019, the Art Collector sued Dunlap and Meta1 in Bexar County, Texas to stop them from claiming ownership over his art (the "Art Lawsuit").

31.     Undeterred, Dunlap modified the Whitepaper in approximately April 2019, maintaining its claim that Meta1 owned $1 billion in art, but adding that the Coin was also backed by "gold bonds."

32.     On June 13, 2019, the Art Collector obtained a final judgment declaring that neither Dunlap nor Meta1 "has any interest, right, or title to the artwork [which Meta1 claimed it

owned]" and awarding the Art Collector $25 million in damages for slandering the Art Collector's title to the paintings and interfering with his prospective contractual relations with buyers of the art.

### 2. *Meta1 Lied About Owning Gold*

33.     Meta1 has also claimed that it owns $2 billion in gold.  This was another lie, despite Meta1, Dunlap, and Schmidt's efforts to convince investors otherwise.

34.     In February 2019, Dunlap, acting by and through Clear, worked with a company called ICTS, LLC ("ICTS"), who contracted with a company (the "Claim Company") who owned an unpatented mining claim to an 80-acre parcel of public land in Lincoln County, Nevada ("Nevada Claim").  ICTS agreed to provide start-up capital within 30 days to the Claim Company, which would then work the land and split any profits from resulting mineral production ("2019 Contract").

35.     As part of the negotiations, ICTS asked the Claim Company to give Clear a limited power of attorney to "arrange for finance loans and leveraging of the assigned assets" and a quitclaim deed, which purported to transfer its mining claim to Clear.  The Claim Company representative told ICTS that the quitclaim deed alone was worthless to convey rights or title, and was not official until additional documentation is sent to the Bureau of Land Management, approved, returned, and recorded with the county.  The ICTS representative, acting on behalf of and at the direction of Dunlap and Clear, told the Claim Company that the quitclaim deed he signed was "good enough" to show investors, and that they did not actually need to transfer title.

36.     Nonetheless, upon information and belief, Meta1, Dunlap, and Schmidt used the worthless deed to misrepresent to prospective investors and investors that Meta1 owned gold or a

producing gold mine.

37.     However, ICTS never performed under the 2019 Contract, and the Claim Company never received any start-up money, or other funds, as promised.  Neither ICTS, Clear, Dunlap, nor Meta1 have, or ever had, any ownership interest in any mining claim to the Nevada Claim.

38.     Further, the Nevada Claim has never produced gold in any value, let alone $2 billion of gold.  There is also no gold mine on the property.  And, contrary to representations made by Dunlap and Schmidt to prospective investors, there are no "vaults of gold" containing gold bricks from this property, because none exist.

### 3.  Defendants' Deception in Marketing and Selling the Coin to Investors Worldwide

39.     In approximately September 2018, Schmidt joined the scheme and, along with Dunlap and Bowdler, began extensively marketing the Coin and soliciting investors worldwide to invest in Meta1.

40.     Defendants solicited investors through the Meta1 website and the Whitepaper, at in-person presentations and "workshops" given around the country and internationally, in periodic email newsletters, on websites related to the Defendants, and on Internet radio broadcasts accessible worldwide on numerous online fora such as BlogTalkRadio, YouTube, and Facebook.

41.     Meta1, through Dunlap and Schmidt, claimed to offer 450 million Coins to the general public at a price of $22.22 per Coin, and purported to allocate a specific number of Coins to investors based on their investment.   Meta1 investors received a paper receipt as confirmation of their purchase, and Dunlap and Schmidt represented that Meta 1 would assign a proportionate value of the art collection (and later, gold) to each Coin.

42. Meta1, however, has never distributed any Coins to investors.

43. The Defendants claimed that Meta1 investors would earn a return on their investment in two ways: (1) the underlying assets (first art, and later gold) would naturally appreciate, thereby increasing the value of each Coin; and (2) Meta1 would purchase additional art pieces or collections (and later, additional gold), and assign the value of those assets equally among the existing 450 million Coins, thereby increasing the value of each Coin. Dunlap and Schmidt projected exorbitant returns—as high as 224,923%—and often told prospective investors that, within two years, each Coin would be worth as much as $50,000 or more.

44. At all times, the most basic assurance Meta1, Dunlap, and Schmidt provided investors about the Coin—that it was backed by billions of dollars of assets Meta1 already owned, and more assets it would acquire—was completely fabricated.

45. During the relevant period, as described herein, the Defendants also falsely and repeatedly claimed, among other things: (a) that KPMG was auditing Meta1's gold assets; (b) that Meta1 formed its own investment bank and developed its own digital currency exchange; (c) that Meta1 had its own debit card; (d) that the Coin is safe and risk-free in that it will never lose value; and (e) that a public offering of the Coin on its own exchange was imminent. None of these statements was true, and these misstatements were highly material to investors.

46. Defendants falsely represented KPMG's involvement to provide prospective and current investors with comfort that one of the world's largest independent financial audit firms had verified and endorsed Meta1's gold asset valuations. In fact, KPMG has never audited Meta1, and has no current or past business relationship with Meta1 or any related entity or individuals.

47. Defendants also lied about the investment returns the Coins would generate.

While the particular rate of return constantly varied, it was always exorbitant.  For example, Schmidt and Dunlap represented that each Coin (sold for $22.22 or $44.44, depending on when it was purchased) would be worth up to $50,000—up to a 224,923% return—as a "very conservative value."  As Defendants knew, or were severely reckless in not knowing, Meta1 owned no significant assets, including either art or gold, so there was no reasonable basis for Defendants to project any investment returns, let alone such exorbitant returns.

48.     In particular, as described herein, Meta1, Dunlap, and Schmidt falsely represented that the Coin investment would generate returns stemming from: (1) additional purchases of the art and/or gold that would, in turn, appreciate in value; (2) the appreciation in value of the Coin due to the supposed increase in demand for the coins after Meta1 launched an ICO, which was imminent; and (3) the expertise of Dunlap and the Meta1 team, which included a "state-of-the-art in-house forensics team" and a sophisticated technology staff and laboratory in Sedona, Arizona.  Defendants falsely stated that these factors would "launch META 1 Coin values in the Trillions of Dollars outperforming other coin currencies [such as Bitcoin], which "has no financial security backing.  META 1 Coin is backed by Surety Bonds and Fine Art with skyrocketing values over the last century!"

49.     In reality, as the Defendants knew, or were severely reckless in not knowing: (1) Meta1 owned no assets to back the Coin; (2) the "surety bond" was a bogus instrument simply printed on certificate paper; (3) Meta1 did not use investor money to purchase "additional" assets; (4) there were no actual plans, and Meta1 had no ability, to launch an ICO; and (5) Meta1 had no "forensics team" as described and no sophisticated laboratory or operations.  Instead, Defendants controlled Meta1 and conducted their fraudulent scheme from their homes; Meta1's addresses are mailboxes at UPS stores in Sedona, Arizona and Boca Raton, Florida, and it has no

physical locations anywhere.

50. From April 2018 to the present, using deceptive acts and material misrepresentations described herein, Defendants raised at least $4.38 million from at least 150 investors in 32 states and at least five foreign countries.

**B.    Defendants' Material Misrepresentations**

***1.    False and Misleading Statements on Meta1's Website And In Its Whitepaper***

51. Throughout the relevant period, the website directed investors to call Meta1 to purchase the Coin. When potential investors called Meta1 with questions about investing in the Coin, Meta1's representatives, who worked from their homes, directed potential investors to go to the website to view the Whitepaper.

52. Several versions of the Whitepaper contain biographies of members of the supposed "core team of Principle Trustees, Board Members, [and] technical and administrative staff performing the daily operations." Dunlap was and is listed as a founder, the "architect" of the Coin, and the "Executive Trustee and Global Visionary" for Meta1, who "oversees the technology regarding the cyber coin and the deployment of all technology for promotions and legal establishment of Art." Bowdler was and is listed as a co-founder and "Trustee, Secretary [and] Director of Business Development" whose "resources and skill set have allowed her to access human consciousness and understand the market entirely." Schmidt was and is listed as "Public Relations/Board Member" for Meta1. His biography says that "[h]is business is the Sedona Connection," and that he "has a background in banking and finance and has been a part-time market trader for over 20 years." Schmidt's biography also highlights the 12 years he spent in the Washington State Legislature, his military service, and his seminary training, giving the false impression that his representations about the Coin are trustworthy.

53.     Investors who transferred funds to Meta1 never actually received a digital asset, token, or coin.  Instead, investors were given either nothing or a "receipt of Coin Certificate" created by Meta1.

54.     The website continues to falsely represent that an investment in the Coin is "Safe & Secure."

55.     In addition, several versions of the Whitepaper claim that the Coin "is exchangeable for all major crypto and fiat currencies by several exchanges," that Meta1 has its own investment bank, and that Meta1 offers a debit card to its investment bank account holders.  None of these claims is true.

### 2.   *False and Misleading Statements on Internet Broadcasts and in Live Workshops*

56.     During the relevant period, Defendants repeated the same misrepresentations about the Coin to the general public on Schmidt's radio shows and other Internet broadcasts, in an emailed newsletter, and during in-person workshops held nationwide and internationally.

57.     The following are a few examples of the materially false and misleading statements Defendants made during the relevant period.

### September 5, 2018 Crypto Visions Internet Talk Show (Dunlap and Bowdler)

58.     On September 5, 2018, Dunlap and Bowdler appeared together to promote the Coin on an Internet talk show called "Crypto Visions, Evolutionary Journeys" ("Crypto Visions"), which was hosted by a self-proclaimed psychic and is accessible on YouTube.  The show's host claimed that "Spirit Guides" empower her to recommend specific cryptocurrencies.  On this show, Dunlap falsely claimed that Meta1: (1) owns $1 billion worth of art that Dunlap purchased with his own money, insures the art with a $1 billion surety bond, and keeps the art in a vault; (2) owns a forensics laboratory in Sedona, which Dunlap uses to

authenticate all of the art that Meta1 acquires, and that Dunlap developed an authentication process; (3) is "operating outside the jurisdiction of the state and federal government, and so we're very, very let's say astute, regarding asset protection"; (4) owns its own exchange and "all aspects of source code"; (5) is acquiring its own offshore bank; (6) acquired a company which will enable Meta1 to offer a "non-bank credit card"; (7) developed a "smart contract" which ensures that the Coin cannot be sold for less than asset value; and (8) has a goal of "get[ting] the asset value to . . . several trillion dollars."

59.    Bowdler contributed to the deception, telling the Crypto Visions audience that "the Coin has been specifically architected out of the angelic realm" and that it is "really exciting when people find out what we're doing with the art."  Bowdler told the audience that she channeled "the Archangel Metatron," who told her that: (a) of all the cryptocurrencies being issued, only 15-20 would be left standing; and (b) the Coin would be one of them.  Bowdler also told the audience that Metatron and Abraham Lincoln revealed to her what would happen in the world's financial and economic structure over the next 20 years.  Because the audience shared her "metaphysical beliefs," Bowdler knew her statements would influence them to invest in the Coin.

### October 3, 2018 Radio Show (Schmidt and Dunlap)

60.    On the October 3, 2018 broadcast of The Sedona Connection, Dunlap and Schmidt represented that the Coin Offering was the first time that "everyday people" could invest in fine art that previously was available only to the ultra-wealthy.  Dunlap explained that he used rare art to back the Coin because "there's just a lot of fun with art.  It's very secure, it trades in any market condition, and it's appreciated like no other asset, and it outperforms gold every day of the week."  Dunlap falsely claimed that Meta1: (1) bought an art collection that

appraised for as high as $1.2 billion, is "perfect in forensics and providence," and is insured for $1 billion; (2) has "one of the most advanced forensics labs" in Sedona; and (3) has its own bank, exchange, and a debit card which investors will get after the ICO.

61.     Dunlap and Schmidt falsely claimed that: (1) "you can be guaranteed if you purchase a Meta 1 Coin, the value of that coin will never, ever fall below the value of the combined asset of the art that the company has backing it up"; (2) Dunlap is in negotiations to pick up trillions of dollars of new art, and that in two years, a coin purchased for $22.22 could be worth up to $40,000 in "asset value" and more in "market value"; (3) "it has a 99% certainty that it's going to skyrocket in value because you're going to have the opportunity to acquire the coin before it goes public, [which is] very similar to buying Bitcoin when it was at 50 to $150 per coin and it went to $20,000;" and (4) "you have the opportunity to get in something on the ground floor that you can't lose on."

### April 24, 2019 Radio Show (Dunlap and Schmidt)

62.     Dunlap and Schmidt had the following discussion:

SCHMIDT: [P]eople have been viciously attacking us and calling us scammers. And they've been telling everybody, "Call the SEC. Call the SEC and report them." And here's what's so ironic. Robert . . . recently had about a one-hour discussion with a man from the SEC. And the fact that he was so impressed with everything that we're doing, that's absolutely upfront and legal, he came in and bought coins. Was that correct?

DUNLAP: Absolutely.

SCHMIDT: Yeah.

DUNLAP: So the person I was speaking with, has been working with, is with the SEC, legal counsel for, you know, over a decade plus. And when he understood the entirety of our presentation and our legal disposition, and the architecture that we created, he was extremely, extremely impressed. He had very little to say regarding any shortcomings or alleged illegalities. There's no illegalities. He was just absolutely impressed. And he actually is, he's coming on board very strong with, you know, investing in the Meta 1 coin. So yeah. That was, it was a lot of fun. And

you know, Dave, we've, we've known that this is a very, very legal and very legitimate operation. The one thing the SEC resource did say, he said that we are leading the way with KYC, which is Know Your Clients. And our equity position, meaning the asset valuation and the asset itself. He said we're leading the way in equity. We're receiving anything ever considered, you know, out there right now.

63.     As Dunlap and Schmidt knew, or were severely reckless in not knowing, those statements were false.  In fact, Dunlap later admitted in testimony during the SEC's investigation prior to the filing of this lawsuit, he had never spoken with anyone at the SEC.

### October 14, 2019 Radio Show (Dunlap and Schmidt)

64.     On the October 14, 2019 Radio Show, Schmidt and Dunlap had the following discussion:

SCHMIDT:  Okay, well, are we ready then to make the big announcement?

DUNLAP:  Which one?  Which announcement would you like to make?

SCHMIDT:  What you said at the workshop in Australia about how much assets you have backed up for the coin, what you have out there as a value for it?  Or is that something you want to make an announcement here?

DUNLAP:  Well, yeah, I can make that announcement.  But it has -- you know, it's complex.  It is simple.

SCHMIDT:  Right, um-hmm.

DUNLAP:  So what Dave is alluding to, there was a show in Hawaii in which I wish I could have been there physically, but I came in through Skype.  And I was mentioning to the coinholders and the participants of Dave's workshop, you know, someone asked a question, so, I mean, what do you mean the coin can go to 24,000 or a zillion dollars or whatever, you know?  They're like, what are you talking about, you know?  And so I said, very simply, we have the assets and we always have. We have enough assets to run this coin by our smart contract modality, which is on the white papers, we have the assets to run them as, you know, quite honestly, very high.   What number did I say?

SCHMIDT:  Can we say what you said at Australia?

DUNLAP:  Absolutely.  I can't remember.

SCHMIDT:  At Australia, when I brought him on Skype, he said they have now the assets to put the asset value of the coin at $22,000 a coin.

DUNLAP:  Oh, absolutely.

SCHMIDT:  And it's actually -- then in Hawaii a week later, you said it's beyond that.

DUNLAP:  Yeah.

SCHMIDT:  Folks, you just heard me right. Did you hear?  Remember, this coin is not public yet.  And it was about three or four months ago, you had an offer from an individual to buy all the remaining coins, an $8 billion offer, and you turned it down.

DUNLAP:  Oh, absolutely.

SCHMIDT:  Because this is a coin that's designed for humanity.  It's designed for everyday people like you and me.  Right now, you can buy the coin before it goes public at $44, and it's going to be an asset-backed coin and you already have assets to have it over $22,000 a coin.

DUNLAP:  Yeah, way, way over 22,000.

SCHMIDT:  Way over.  Now, we had talked about this, is that when the coin goes public, we'll use the 22,000 number, just for to keep it simple.

DUNLAP:  Right.  And that's one trillion in assets, if anyone does the math, yeah.

65.     Dunlap and Schmidt both knew, or were severely reckless is not knowing, that these representations were false.

### November 6, 2019 Radio Show (Schmidt)

66.     On the November 6, 2019 Radio Show, Schmidt responded to a question posted to Facebook asking about the Art Lawsuit, and said:

The guy who did the paintings was an absolute fraud.  He flat out fabricated his ownership of the paintings and what he filed against—against Robert and META 1 Coins, they counter-filed against him.  It ended up going to court, and that guy is on his way to jail.  . . . you could go on the Internet, and you could say that, you know, META 1 Coin was involved in fraud.  You can -- the man who put the information out fabricated all that stuff.  He said he owned the paintings when he never legally owned them, and he has charges filed against him, and he's the one

19

that's on his way to jail.

67.     As Schmidt knew, or was severely reckless in not knowing, his response was false.

### January 18, 2020 Workshop in Atlanta, Georgia (Schmidt)

68.     Schmidt told investors at a January 2020 Workshop in Atlanta, Georgia that the Coin was secured by $2 billion in gold that Meta1 owned. He said that Meta1 had deferred going public because KPMG was in the middle of auditing the "gold mine" that backed the investment.

69.     When one investor at the Workshop questioned the legitimacy of the Coin, Schmidt and others attempted to physically remove her from the room, and forced her to leave the workshop.

70.     Later, Dunlap sent the investor a certified letter labeled: "**CEASE AND DESIST SLANDER, DEFAMATION OF CHARACTER**," where he threatened legal action, commented that he was "looking forward" to such action, and attempted to intimidate and scare the investor.

### January 15. 2020 (Dunlap and Schmidt) and January 29, 2020 (Schmidt) Radio Shows

71.     On the January 15, 2020 Radio Show, Dunlap claimed that KPMG is auditing Meta1's "metal reserves" and that Meta1 is "the highest rated digital asset that is known at this time." Schmidt chimed in saying, "When you've got KPMG, one of the largest auditing firms in the world doing the audit on Meta1, verifying the amount of gold, you have the authentication that's there, this is for real. This is the real stuff. You can't get much better than that."

72.     On the January 29, 2020 Radio Show, Schmidt told listeners that KPMG, "the largest auditing firm in the United States, if not in the world," is auditing "all of the assets and

the gold that Meta1 has so that you know when the assets are posted, they are audit certified and verified by probably the largest auditing firm in the world."

73.     These statements are false.  KPMG has never audited any purported gold assets of Meta1 and has no current or prior business relationship with Meta1 or anyone associated with Meta1.

**February 12, 2020 Radio Show (Schmidt and Dunlap)**

74.     On the February 12, 2020 Radio Show, Schmidt misrepresented, among other things, that: (1) the Coin is "secure and safe" and protected from "government intervention"; (2) the Coin is based on asset value that will never drop, and cannot be sold for less than asset value; and (3) in two years, "$50,000 a coin is going to be a very conservative value.  Okay?  Very conservative value."

75.     Dunlap falsely stated, among other things: (1) the value of a Coin "cannot go down.  It can only go up"; (2) that Meta1 is backed by $2 billion, 100% of which is in gold; and (3) that Meta1 has cash reserves so that if there isn't a buyer for the Coin on the open market, Meta1 will automatically buy it back from the holder.

**C.     Defendants' Non-Responsiveness During the SEC Investigation**

76.     During the SEC's underlying investigation of this matter, the SEC subpoenaed each of the Defendants for documents and to appear to testify.  Each Defendant returned the subpoena to the SEC with the word "Fraudulent" marked on every page.  Schmidt refused to produce documents to the SEC, and refused to testify.  Dunlap refused to produce documents. He appeared for testimony, but refused to answer several important questions, such as whether he drafted the Whitepaper, claiming at various times the questions were ridiculous, the answers

were none of the SEC's business, and he "[has] no contract with the SEC." Bowdler produced some documents, but refused to testify.

**D.    The Coin Offerings Were Illegal, Unregistered Offerings of Securities.**

77.    During the relevant period, the investments offered by Defendants were "securities" within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

78.    Although the Coin Offering purported to be a pre-ICO "private sale" of cryptocurrency, no digital currency actually existed. Instead, the Coin Offering was a scam, and an investment contract, whereby investors gave money to Meta1 with the expectation that the efforts of Meta1 and its principals would yield investment returns. From the investors' perspective, this was a passive investment.

79.    The Coin Offering was not registered with the Commission, nor were any exemptions to registration applicable. The Defendants also sold the Coin to unaccredited investors, and made no efforts to ensure that investors were accredited. In fact, they recklessly disregarded that the investors were not accredited.

**E.    Bank Record Analysis and Use of Investor Funds**

80.    As explained above, through the foregoing false and misleading statements and deceptive acts, Defendants collectively raised approximately $4.38 million in investor funds from at least 150 investors during the relevant period. Contrary to Defendants' representations that investor funds would be used to acquire either additional art or gold assets, none of the investor funds was used to acquire art or gold or anything else to increase the value of the Coin.

81.    There is no evidence that any money moved from Meta1 bank accounts to any Blockchain address, no evidence of digital payments, and no evidence that any investor money

has been used to purchase digital currency.

82.     Instead, the funds fraudulently raised during the relevant period have been channeled through various bank accounts controlled by Dunlap, Bowdler, and the Relief Defendants, including accounts at BBVA Compass Bank, Fidelity Brokerage Services, LLC ("Fidelity"), Branch Banking and Trust Company, Bank of America, N.A. ("BOA"), Morgan Stanley & Co., LLC, BMO Harris Bank, N.A., Navy Federal Credit Union ("Navy Federal"), and Fifth Third Bank.

83.     On November 20, 2018, Bowdler wired $620,000 from Meta1's Fidelity account to her personal account.

84.     On January 31, 2019, Dunlap used over $75,000 of investor funds in Clear's bank account at BOA—which he controlled—to purchase a BMW.

85.     On May 22, 2019, Dunlap and Bowdler wired $605,000 from Meta1's Navy Federal account to Bowdler's personal account.

86.     On July 1, 2019, Dunlap wired $1 million from a Clear account to a Pramana account held at Fifth Third Bank controlled by Shamoon.

87.     On July 15, 2019, Dunlap and Bowdler wired $312,000 from Meta1's Navy Federal account to Bowdler's personal account.

88.     On December 16, 2019, Shamoon opened an account for Meta 1 Coin Trust at BMO Harris Bank ("BMO Harris Account"). Shamoon is the only signatory on the BMO Harris Account; however, the account was accessed from both Illinois, where Shamoon lives, and Florida, where, Dunlap, Bowdler, and Schmidt live.

89.     Shortly after opening the BMO Harris Account, Shamoon used $215,276 of investor funds to purchase a Ferrari.

90.     Relief Defendants Pramara and Shamoon have each received the proceeds of fraud in amounts described herein, and have no legitimate claim to those ill-gotten investor funds.

**F.     Continued Deceptive Acts and Threatened Investor Harm**

91.     On a February 12, 2020 Radio Show, Dunlap claimed he was in the process of hiring 200 people within the next two months.  Additionally, Schmidt continues to advertise upcoming conferences around the world.  In fact, Schmidt's websites promote upcoming Workshops in Denver, Boston, Seattle, Phoenix, Puerto Rico, Norway, Sweden, New Zealand, and a cruise, among other places.

92.     In a recent newsletter emailed to investors on February 21, 2020, Dunlap and Schmidt, through Meta1, falsely stated (emphasis in original):

> We are pleased to announce that the META 1 Coin value will increase in value dramatically on March 1st, 2020.
> We are in the final stages of asset verification "Audit" for the launch of META 1 Coin and very excited to publish the audited META 1 Assets. Orders placed before March 1st, 2020 will be honored at the $44.44 value.
>
> **The META Trust System** is in the final development stage. This is a very exciting accomplishment and worth $6000-$8000 to each coin holder. We are so thrilled to be able to offer this to all of you. The META Trust System includes a Private Irrevocable International Trust and extremely comprehensive Secured Party Creditor instruments and UCC filings. This is the complete package for ensuring our Human rights.
>
> **Our established track record** of success and performance prove META 1 SPC filings are superior in nature with a comprehensive 'Private' status.
> **META 1** has added several Secured Party Creditor experts to our team and will be offering educational material and additional service opportunities for coin holders.

93.     The Meta1 website is live today, and investors may currently transfer funds through the Meta1 website.

94. Defendants are continuing to solicit investors and their fraud is ongoing.

## CLAIMS FOR RELIEF

### First Claim

### Fraud in Connection with the Purchase or Sale of Securities
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder

### (Against All Defendants)

95. Plaintiff repeats and incorporates by reference paragraphs 1 through 94 of this Complaint as if set forth *verbatim* herein.

96. By engaging in the conduct described above, directly or indirectly, with *scienter*, in connection with the purchase or sale of securities, and by use of the means and instrumentalities of interstate commerce the mails, or any facility of a national securities exchange: (a) Defendants Meta1, Dunlap, Bowdler, and Schmidt employed a device, scheme or artifice to defraud; and/or (b) Defendants Meta1, Dunlap, and Schmidt made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) Defendants Meta1, Dunlap, Bowdler, and Schmidt engaged in an act, practice, or course of business that has operated or will operate as a fraud or deceit upon other persons.

97. By engaging in the conduct described above, each Defendant violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## Second Claim

### Fraud in the Offer or Sale of Securities
### Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]

### (Against All Defendants)

98.     Plaintiff repeats and incorporates by reference paragraphs 1 through 94 of this Complaint as if set forth *verbatim* herein.

99.     By engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, and by use of the means and instrumentalities of interstate commerce the mails, or any facility of a national securities exchange:  (a) Defendants Meta1, Dunlap, Bowdler, and Schmidt employed a device, scheme, or artifice to defraud;  (b) Defendants Meta1, Dunlap, and Schmidt obtained money or property by means of untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) Defendants Meta1, Dunlap, Bowdler, and Schmidt engaged in a transaction, practice, or course of business which operates or would operate as a fraud and deceit upon the purchaser.

100.     With respect to violations of Section 17(a)(1) of the Securities Act, Defendants acted knowingly or with severe recklessness regarding the truth.  With respect to violations of Sections 17(a)(2) and (3) of the Securities Act, Defendants were at least negligent in their actions regarding the representations and omissions alleged herein.

101.     For these reasons, Defendants Meta1, Dunlap, Bowdler, and Schmidt each have violated and, unless enjoined, will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF

### Unregistered Offer and Sale of Securities
### Violations of Sections 5(a) and 5(c) of the Securities Act

### (Against All Defendants)

102.     Plaintiff repeats and incorporates by reference paragraphs 1 through 94 of this

Complaint as if set forth *verbatim* herein.

103.     Defendants directly or indirectly offered and sold securities in offerings that were

not registered with the SEC and that were not subject to a valid exemption to registration.

104.     By engaging in the conduct described above, Defendants, directly or indirectly,

singly or in concert with others, have made use of the means or instruments of transportation or

communication in interstate commerce, or of the mails, to offer to sell or to sell securities, or

carried or caused to be carried through the mails or in interstate commerce, by means or

instruments of transportation, securities for the purpose of sale or for delivery after sale, when no

registration statement had been filed or was in effect as to such securities, and when no

exemption from registration was applicable.

105.     By engaging in the conduct described above, Defendants violated, and unless

enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§

77e(a) & 77e(c).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

(1)     Enter an Order finding that Defendants committed, and unless restrained will

continue to commit, the violations alleged in the Complaint;

(2)     Permanently enjoin Defendants from future violations of Section 17(a) of the

Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and

Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e];

(3)     Permanently enjoin Defendants from directly or indirectly participating in the issuance, purchase, offer, or sale of any securities provided, however, that such injunctions shall not prevent Dunlap, Schmidt, or Bowdler from purchasing or selling securities listed on a national securities exchange for their own personal accounts;

(4)     Order Defendants and Relief Defendants to disgorge all funds received from the Defendants' illegal conduct alleged herein, with prejudgment interest;

(5)     Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

(6)     Grant such other and further relief as the Court may deem just and proper.


Dated:    March 16, 2020.                    Respectfully submitted,



                                             Jennifer D. Reece
                                             Texas Bar No. 00796242
                                             James E. Etri
                                             Texas Bar No. 24002061
                                             United States Securities and Exchange Commission
                                             Burnett Plaza, Suite 1900
                                             801 Cherry Street, Unit 18
                                             Fort Worth, Texas 76102
                                             Direct phone: (817) 978-6442 (JDR)
                                             Fax: (817) 978-4927
                                             reecej@sec.gov

                                             ATTORNEY FOR PLAINTIFF
                                             SECURITIES AND EXCHANGE COMMISSION

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

SECURITIES AND EXCHANGE COMMISSION

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
U.S. Securities and Exchange Commission
Jennifer D. Reece, 801 Cherry Street, Suite 1900
Fort Worth, TX 76102, (817)978-6442, ReeceJ@sec.gov

## DEFENDANTS

Meta 1 Coin Trust, Robert P. Dunlap, individually and d/b/a Clear International Trust, Nicole Bowdler, and David Schmidt, and RELIEF DEFENDANTS

Pramana Capital, Inc. and Pete K. Shamoun, aka Pete P. Shamoon
County of Residence of First Listed Defendant    Palm Beach County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1  U.S. Government
Plaintiff

☐ 2  U.S. Government
Defendant

☐ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                        *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans | ☐ 345 Marine Product Liability | Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| (Excludes Veterans) | | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | | ☐ 862 Black Lung (923) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 465 Other Immigration Actions | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
5(a), 5(c), and 17(a) of the Securities Act of 1933 [15 U.S.C. §§ 77e(a) and (c), 77q(a)] and Section 10(b) of the
Brief description of cause:
Violations of Federal Securities Laws.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____    DOCKET NUMBER _____

DATE
3/16/2020

SIGNATURE OF ATTORNEY OF RECORD
Jennifer D. Reece        *Jennifer D. Reece*

## FOR OFFICE USE ONLY

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____