**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § |
| | § |
|     Plaintiff, | § |
| | § |
| v. | § |
| | § |
| META 1 COIN TRUST, | § |
| ROBERT P. DUNLAP, individually and d/b/a | § Civil Action No.: 1:20-cv-273-RP |
|     CLEAR INTERNATIONAL TRUST, | § |
| NICOLE BOWDLER, and DAVID A. SCHMIDT, | § |
| | § |
|     Defendants, | § |
| | § |
|     and | § |
| | § |
| PRAMANA CAPITAL, INC., | § |
| PETER K. SHAMOUN a/k/a PETER K. SHAMOON, | § |
| WANDA IRONHEART TRAVERSIE-WARNER, | § |
| ALFRED DEWITT WARNER JR. | § |
| AND IRONHEART TRUST, | § |
| | § |
|     Relief Defendants. | § |

**PLAINTIFF'S MOTION FOR MONETARY REMEDIES AND FOR ENTRY OF FINAL**
**JUDGMENT AS TO ALL DEFENDANTS AND WARNER RELIEF DEFENDANTS**
**AND BRIEF IN SUPPORT**

Dated:  September 22, 2022

Respectfully submitted,

*/s/ Jennifer D. Reece*
Jennifer D. Reece
Texas Bar No. 00796242
James E. Etri
Texas Bar No. 24002061
United States Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, Texas 76102
Direct phone: (817) 978-6442 (JDR)
Fax: (817) 978-4927
reecej@sec.gov
COUNSEL FOR PLAINTIFF

i

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................. iii

I.      PROCEDURAL POSTURE AND SUMMARY OF REQUESTED RELIEF ................ 1

II.     SUMMARY OF RELEVANT FACTS ........................................................... 3

III.    ARGUMENT AND AUTHORITIES ............................................................. 8

        A.  Legal Standards ....................................................................... 8

        B.  The Court Should Set the Amount of Disgorgement and PJI as to the
            Defaulting Defendants and Warner Relief Defendants ......................... 9

            1.  Meta1/Dunlap ................................................................. 10

            2.  Bowdler ........................................................................ 11

            2.  Warner Relief Defendants .................................................. 11

        C.  The Court Should Order Schmidt to Pay Disgorgement and PJI
            in the Amounts Requested .......................................................... 12

        D.  The Court Should Impose Maximum Civil Penalties on the Defendants for their
            Illegal Conduct ..................................................................... 12

IV.     CONCLUSION ................................................................................ 16

# TABLE OF AUTHORITIES

## Cases

*Liu v. SEC*
    140 S. Ct. 1936 (2020) ...................................................................8, 9, 10, 11

*First City Fin'l Corp.*,
    890 F.2d 1215 (D.C. Cir. 1989) .................................................................9

*Nishimatsu Constr. Co. Ltd. v. Houston Nat'l Bank*,
    515 F.2d 1200 (5th Cir. 1975) ..................................................................2

*SEC v. AMX, Int'l, Inc.*,
    7 F.3d 71 (5th Cir.1993) ...........................................................................8

*SEC v. Halek*,
    537 F. App'x 576 (5th Cir. 2013) ..........................................................9, 10

*SEC v. Hallam*,
    42 F.4th 316 (5th Cir. 2022) .....................................................................9

*SEC v. Helms, et al.*,
    2015 WL 5010298 (W.D. Tex. Aug. 21, 2015) ........................................8, 9

*SEC v. Kern*,
    425 F.3d 143 (2nd Cir. 2005) ...................................................................13

*SEC v. Life Partners Holdings, Inc.*,
    71 F. Supp. 3d 615 (W.D. Tex. 2014) .......................................................13

*SEC v. MacDonald*,
    699 F.2d 47 (1st Cir. 1983) .......................................................................9

*SEC v. Manor Nursing Ctrs., Inc.*,
    458  F.2d 1082 (2nd Cir.1972) ..............................................................8, 12

*SEC v. Rockwell Energy of Texas, LLC, No. H-09-4080*,
    2012 WL 360191 (S.D. Tex. Feb. 1, 2012) ..............................................8

*SEC v. Seghers*,
    298 F. Appx. 319 (5th Cir. 2008) .............................................................9

*SEC v. Sneed*,
    2021 WL 4202171 (N.D. Tex. [Dallas] Sept. 10, 2021) ...........................9, 12

*SEC v. United Energy Partners, Inc.*,
   88 Fed. Appx. 744 (5th Cir. 2004) ....................................................................10

*SEC v. Voight*,
   2021 WL 5181062 ..............................................................................8, 9, 13

*SEC v. Warren*,
   534 F.3d 1368 (11th Cir. 2008) ........................................................................9

## Statutes and Rules

Securities Act Section 5 ...........................................................................................2

Exchange Act Section 10(b) .....................................................................................2

Securities Act Section 17(a) ................................................................................... 2

Exchange Act Section 21(d) .........................................................................8, 12, 13

Exchange Act Rule 10b-5 .........................................................................................2

17 C.F.R. 201.1001 .......................................................................................12, 13

Pursuant to the Court's Orders dated October 5, 2020 [Doc. 101] and February 8, 2021 [Doc. 114], Plaintiff Securities and Exchange Commission ("Plaintiff" or "Commission") files this Motion for Monetary Remedies and Brief in Support, and Motion for Entry of Final Judgment as to: (1) Defendants Meta 1 Coin Trust ("Meta1"), Robert P. Dunlap, individually and d/b/a Clear International Trust ("Dunlap"), and Nicole Bowdler ("Bowdler") (together, "the Defaulting Defendants"); (2) David A. Schmidt ("Schmidt") (collectively, with the Defaulting Defendants "Defendants"); and (3) Relief Defendants Wanda Ironheart Traversie-Warner ("Traversie"), Alfred Warner ("Warner"), Ironheart Trust ("Ironheart") (together, the "Warner Relief Defendants"), and respectfully shows as follows:[1]

## I.

## PROCEDURAL POSTURE AND SUMMARY OF REQUESTED RELIEF[2]

On February 8, 2021, the Court granted Plaintiff's Motion for Default Judgment against the Defaulting Defendants and the Warner Relief Defendants. Doc. 114. The Court imposed permanent injunctive relief as to the Defaulting Defendants, *see id.,* at pp. 12-14, and ordered that the Defaulting Defendants "*shall pay* disgorgement of ill-gotten gains and prejudgment interest thereon, and a civil penalty[]." *Id.* at p. 14 (emphasis added). The Court further ordered that the Warner Relief Defendants "*shall pay* disgorgement of all funds they have received in connection with the Defendants' illegal acts described in the Amended

---

[1]  In support of this motion, Plaintiff attaches as Exhibit 1, and fully incorporates herein, the Declaration of SEC accountant Carol Hahn ("Hahn Dec.").

[2]  On February 3, 2021, the Court entered an Agreed Final Judgment as to Relief Defendants Pramana Capital, Inc. and Peter K. Shamoun, a/k/a Peter K. Shamoon (the "Shamoon Relief Defendants"), ordering them to pay, jointly and severally, disgorgement of $7,457,998 plus PJI in the amount of $176,152.79, for a total of $7,634,150.79. [Doc. 113.]  Of this amount, the Commission has collected $1,519,817.79.  [Hahn Dec. at ¶ 25.]

Complaint." *Id.* (emphasis added).

As to Schmidt, on October 5, 2020, the Court entered an agreed partial judgment [Doc. 101] imposing injunctive relief, and ordering that the Court shall determine whether monetary remedies are appropriate, and if so, in what amounts, given the facts alleged in the Redacted Amended Complaint [Doc. 63 (hereinafter "Complaint")], which the Court must accept and deem true. *See* Doc. 101, at p. 5, ¶ V.  Schmidt is precluded from arguing that he did not violate the federal securities laws as alleged in the Complaint.  *Id.*

 For purposes of this motion, Schmidt has admitted the allegations in the SEC's Complaint.  [Doc. 100-1, at p. 4.]  Likewise, because defendants have defaulted, the "well-pleaded allegations of fact" against them are admitted.[3]  *See* Doc. 114, at pp. 4-5 (citing *Nishimatsu Constr. Co. Ltd. v. Houston Nat'l Bank,* 515 F.2d 1200, 1206 (5th Cir. 1975). Thus, in determining the appropriate monetary remedies to be imposed against the parties, the Court must accept as true that: (1) the Defendants committed securities fraud in violation of Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder and Section 17(a) of the Securities Act of 1933 ("Securities Act"); (2) in committing their fraudulent scheme, the Defendants acted with a high degree of scienter; (3) the Defendants offered or sold unregistered securities in violation of Sections 5(a) and 5(c) of the Securities Act; and (4) the Warner Relief Defendants are in possession of ill-gotten gains, to which they have no legitimate claim.

Based on these violations, and on the record of this case, the Commission requests: (1) an order finding the Defendants and the Werner Relief Defendants liable to pay disgorgement, prejudgment interest ("PJI") and/or civil penalties as requested herein; and (2) the entry of the

---

[3]  The SEC incorporates the allegations of the Complaint herein.  [See Doc. 63.]

attached proposed final judgments as to all remaining parties.

## II.

## SUMMARY OF RELEVANT FACTS

1.      From April 2018 through the present (the "relevant period"), Defendants, both directly and through entities they control, have raised over $15.2 million from at least 800 investors in 40 states and eight foreign countries, through deceptive acts and materially false and misleading statements and omissions.  [Compl., at ¶ 2; Hahn Dec. at ¶ 20 (updating the numbers).]  For example, Defendants have falsely stated that: (a) investors were, in fact, purchasing asset-backed digital coins; (b) Meta1 owned $1 billion in art insured against loss by a surety bond, and later, that Meta1 owned $2 billion [and now $8.8 billion] in gold assets; (c) KPMG, one of the largest independent financial audit firms in the world, was auditing Meta1's gold assets; (d) Meta1 formed its own investment bank and developed its own digital currency exchange; (e) the Coin is safe and risk-free and will never lose value; (f) an initial public offering of the Coin ("ICO") on its own exchange was imminent; and (g) each Coin, sold for either $22.22 or $44.44 would in two years be worth $50,000—up to a 224,923% return—as a "very conservative value."  [Compl. at ¶ 2.]

2.      Defendants enticed investors with the allure of a cryptocurrency, but the securities offering is nothing but a vehicle to steal investors' money.  [*Id.* at ¶3.]  In reality, as Defendants knew, or were severely reckless in not knowing, each of the statements listed above was, and is, false.  There is no reasonable basis to project any investment returns—much less a 224,923% return—given that, as Defendants knew or were severely reckless in not knowing, victims were simply investing in a scam.  [*Id.*]  And although Defendants assured investors that KPMG verified and affirmed Meta1's gold valuations to bolster their claims that the Coin was safe and

3

risk-free, those assurances were lies.  [*Id.*]  KPMG never performed any audit services for Meta1, or anyone associated with Meta1 or any of the Defendants. [*Id.*]

3.      Despite many court orders and even an arrest warrant, Dunlap and Meta1 continue to operate and market the investment scheme through various means, including its website (https://meta1coin.vision), social media, Zoom calls with investors and prospective investors, in-person seminars, and on an internet radio show (https://www.thejimpriceshow.com). [Hahn Dec. at ¶ 4.]  Meta1's current White Paper now claims that the Meta1 Coin is backed by $8.8 billion in gold assets (up from $2 billion claimed gold assets in March 2020).  [*Id.*]  By comparison, the current reported value of United States Treasury-owned gold held in reserve at Fort Knox is approximately $6.2 billion.  *See* Status Report of Gold Reserve, available at *https://fiscaldata.treasury.gov/datasets/status-report-government-gold-reserve/u-s-treasury-owned-gold*.  Meta1 continues to falsely claim that it is free from U.S. government oversight.  [*Id.*]

4.      As recently as September 12, 2022, Meta1/Dunlap sent an email blast to investors and prospective investors inviting them to join the Meta1 "Executive Team" at a "Meta1 Workshop" to be held in Las Vegas on September 24, 2022.  The email featured Dunlap as a speaker at the event, and listed the "current value" of the Meta1 Coin at $377.  Dunlap originally "valued" the Coin at $22.22.  [*Id.* at 5, Hahn Ex. 1.]

5.      On June 13, 2022, Meta1 sent out an email blast advising the public that:

> Both the Crypto Market and the Stock Market are in **FREE FALL,** Wiping out **Billions** as they go down.  Meta1 coin has not gone down at all, in fact it has Increased in all of this chaos!
> . . .
> **NOW, is the right time to jump in to META1!  "See how cleverly orchestrated Crypto 'financial modeling & design' can help you secure your holdings".**

[*Id.* at 32, Ex. 4, all errors and emphasis in original.]

6.      Dunlap continues to operate the Meta1 scheme through various Meta1 associates. From the start of the scheme through March 16, 2020, when the Court entered its temporary restraining order and imposed an asset freeze [Doc. 8] (the "Initial TRO"), a significant portion of the Meta1 investor proceeds were sent or deposited into accounts controlled by the Shamoon Relief Defendants.  [*Id.* at ¶ 6.]

7.      After the Court froze Shamoon's accounts, Meta1 investor funds were directed to accounts controlled by the Warner Relief Defendants.  [*Id.* at ¶ 8.]  After the Court froze the Warner Relief Defendants' accounts, Meta1 investor funds were directed to accounts controlled by Meta1 board member Richard Grassie.  [*Id.* at ¶ 9.]  Grassie continued a pattern established by Meta1 and Dunlap: open and use a bank account for a short period of time, deposit investor funds, spend investor funds on purposes not disclosed to investors, including the withdrawing of investor funds using cashier's checks to pay other related third parties, and then open a new bank account at a different bank to repeat the process again.  [*Id.* at ¶ 10.]

8.      Investor money was not used for the stated purpose of the investment.  Instead, investor money was distributed to Meta1-related individuals, used to pay bills (such as credit card and loan payments), and used to pay personal expenses and costs associated with marketing the fraud scheme.  [*See id.* at ¶¶ 15-17, 23.]  When Grassie received investor funds paid with crypto assets into his Coinbase account,[4] he converted the crypto assets to U.S. dollars and transferred those funds to his bank accounts.  [*See id.* at ¶ 13.]

9.      Based on the records the Commission obtained from the banks where investor funds were deposited, between April 1, 2018 and December 31, 2021, Meta1 raised at least

---

[4]  At some point, Meta1 began accepting legitimate crypto-assets, such a Bitcoin, as payment for their fake Meta1 Coin.

$15,250,847.22 from at least 800 investors in 40 states and 8 foreign countries.  [Hahn Dec., at ¶ 20.]  To calculate the total disgorgement, the Commission started with the total amount raised of $15,250,847.22, and subtracted $1,317,260.86 in uncashed investor checks found at the time of the initial asset freeze and $482,373.47 in investor returns.  Thus, the total amount of ill-gotten gains realized among the parties is $13,451,212.89.  [*Id.* at ¶ 22.]

10.    Neither the Defaulting Defendants, nor the Warner Relief Defendants produced any kind of accounting, as the Court ordered them to do.  Thus, the Commission's calculations are reasonably approximate, based on the information available to it through subpoena responses from known third parties.  [*Id.* at ¶ 21.]

11.    Schmidt admitted in his deposition that Dunlap paid him approximately $2,000 per month for six to seven months via cashier's checks.  [*Id.* at ¶ 28.] He received $5,000 of investor funds from the Warner Relief Defendants, and another $19,210 from Meta1 and Dunlap. This amount is a low approximation, because it does not include money he received from his workshops where he pitched Meta1 investors, as those amounts are unknown.  [*Id.* at ¶ 28.]

12.    The Commission's requested disgorgement amounts and PJI calculations are summarized in the chart below, along with requested civil penalty amounts:

| Party | Disgorgement | PJI | Penalty | Total |
|---|---|---|---|---|
| **Meta1** and **Dunlap,** jointly and severally | **$10,849,776.47** | $939,183.45 | $10,849,776.47 | $22,638,736.39 |
| Of that total disgorgement: | | | | |
| **Meta1** and **Dunlap,** jointly and severally | $3,370,916.78 | $291,794.87 | | |
| **Meta1/Dunlap,** jointly and severally with Shamoon Relief Defendants | $5,938,180.21[5] | $514,023.55 | | |
| Meta1/Dunlap jointly and severally with **Bowdler** | $1,540,679.48 | $133,365.03 | | |
| **Bowdler,** jointly and severally with Meta1/Dunlap | **$1,540,679.48** | $133,365.03 | $1,540,679.48 (individual penalty) | $3,214,723.99 |
| **Schmidt** | **$24,210.00** | $2,095.68 | $24,210.00 | $50,515.68 |
| **Warner Relief Defendants,** jointly and severally | **$1,057,408.63** | $91,531.90 | N/A | $1,148,940.53 |

[*Id.* at ¶ 31.]

13.     As to all parties, the Commission seeks to recover disgorgement so that it may return those funds to investors who lost significant sums of money when they invested money in the fraudulent scheme.  The Commission believes that it is feasible to distribute the disgorged funds to the Defendants' injured investors.  If Defendants pay the disgorgement amount ordered by the Court, the Commission expects that it will be in a position to distribute the funds ordered to be disgorged to the known victims of Defendants' fraud through a fund that will be administered by a distribution agent to be appointed by the Court, as set forth in the attached proposed final judgments.

14.     The Relief Defendants have no legitimate claim to the investor funds they acquired.

[*See* Doc. 114.]

---

5   This amount excludes the amount the Commission has collected from the Shamoon Relief Defendants.

### III.

### <u>ARGUMENT AND AUTHORITIES</u>

**A.      Legal Standards**

Disgorgement and PJI against Defendants, who are securities law violators, are both

necessary and proper.  *See SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1104 (2nd

Cir.1972) ("[T]he deterrent effect of an SEC enforcement action would be greatly undermined if

securities law violators were not required to disgorge illicit profits."). Section 21(d)(7) of the

Exchange Act expressly authorizes courts to order disgorgement "[i]n any action or proceeding

brought by the [SEC] under any provision of the securities laws."  15 U.S.C. § 78u(d)(7); *see*

*also id.* § 78u(d)(5) ("In any action or proceeding brought or instituted by the Commission

under any provision of the securities laws, the Commission may seek, and any Federal court

may grant, any equitable relief that may be appropriate or necessary for the benefit of

investors").

"In the context of an offering of securities in violation of the securities laws, the proper

starting point for a disgorgement award is the total proceeds received from the sale of the

securities."  *SEC v. Voight, et al.,* 2021 WL 5181062, at *7 (S.D. Tex. [Houston] June 28, 2021

(Slip Copy) (quoting *SEC v. Amerifirst Funding, Inc.,* 2008 WL 1959843, at *3 (N.D. Tex. May

5, 2008)).  Disgorgement is appropriate not only in cases of fraud, but also for any violation of the

securities laws.  *SEC v. Rockwell Energy of Texas, LLC*, No. H-09-4080, 2012 WL 360191, at *6

(S.D. Tex. Feb. 1, 2012) (ordering disgorgement for securities registration violations).

The Court has broad discretion in determining the amount of disgorgement. *See, e.g.*, *SEC*

*v. Helms, et al.*, 2015 WL 5010298, *19 (W.D. Tex. Aug. 21, 2015) (citing *SEC v. AMX, Int'l, Inc.*,

7 F.3d 71, 73 (5th Cir.1993)).  In *Liu v. SEC*, the Supreme Court reaffirmed the Commission's

authority to seek, and the Court's authority to order, disgorgement "that does not exceed a wrongdoer's net profits and is awarded for victims."  140 S. Ct. 1936, 1940 (2020).  *Liu* did not disturb the principle that disgorgement need only be a "reasonable approximation" of profits causally connected to the violation.  *See, e.g.*, *Helms,* 2015 WL 5010298, at *19 (citing *SEC v. Seghers*, 298 F. Appx. 319, 336 (5th Cir. 2008)).  In addition, any risk of uncertainty in calculating the disgorgement amount falls on the wrongdoer whose illegal conduct created the uncertainty. *Voight,* 2021 WL 5181062, at *7 (quoting *First City Fin'l Corp.,* 890 F.2d 1215, 1232 (D.C. Cir. 1989).  "[D]oubts are to be resolved against the defrauding party."  *SEC v. MacDonald*, 699 F.2d 47, 55 (1st Cir. 1983).

Once the SEC meets its initial burden of proving a reasonable approximation, the burden shifts to the defendants to show that the disgorgement amount is not a reasonable calculation.  *SEC v. Hallam*, 42 F.4th 316, 341 (5th Cir. 2022); *SEC v. Sneed,* 2021 WL 4202171, at *10 (N.D. Tex. [Dallas] Sept. 10, 2021) (Slip copy) (citation omitted); *Voight,* 2021 WL 5181062, at *10 (citations omitted). A defendant's current financial situation, or any hardship that disgorgement would impose, are not factors to be considered in determining disgorgement. *SEC v. Warren*, 534 F.3d 1368, 1370 (11th Cir. 2008).

Further, the Court has "flexibility" to impose joint and several liability against "individuals or partners" engaged in "concerted wrongdoing."  *Liu,* 140 S. Ct. at 1945, 1949.  "Joint and several liability is appropriate in securities cases where, as here, individuals collaborate or have close relationships in engaging in illegal conduct."  *SEC v. Halek*, 537 F. App'x 576 (5th Cir. 2013) (punctuation omitted).

## B.     The Court Should Set the Amount of Disgorgement and PJI as to the Defaulting Defendants and Warner Relief Defendants.

The Court has already found that disgorgement and PJI are appropriate as to the

Defaulting Defendants and the Warner Relief Defendants. *See* Doc. 114. The Commission has demonstrated a reasonable approximation of disgorgement and has calculated PJI, as set forth below.

### 1. *Meta1/Dunlap*

The Commission seeks disgorgement from Dunlap and Meta1, jointly and severally, in the amount of $10,849,776.47 (inclusive of the joint and several amounts with Bowdler and the Shamoon Relief Defendants), which represents the amounts that Meta1/Dunlap raised from investors (approximately $14.1M), off-set by: (a) investor returns ($427,465); (b) uncashed checks found at the time of asset freeze ($1.3M); (c) payments to Schmidt ($19,210); and (d) the amounts collected from the Shamoon Relief Defendants pursuant to the Agreed Judgment ($1.5M). [Hahn Dec. at ¶ 25.] Because this case involved a fraudulent offering scheme, where there were no actual investment activities, no legitimate business expenses exist to deduct. *See Liu,* 140 S. Ct. at 1945-46. The Commission calculated PJI from March 16, 2020 using a PJI calculator program, which came to $939,183.45. [Hahn Dec. at ¶ 30-31.]

Joint and several liability is appropriate here. First, Dunlap created, owns, and controls Meta1. [Compl. ¶ 14.] Meta1 and Dunlap acted together as one economic unit, commingling investor funds and using them as one account. [Hahn Dec. at ¶ 25.] Each were partners in concerted wrongdoing, and are equally culpable for the fraudulent scheme. *See Liu,* 140 S.Ct. at 1949; *SEC v. Halek,* 537 Fed. App'x 576, 581 (5th Cir. 2013); *SEC v. United Energy Partners, Inc.*, 88 Fed. Appx. 744 (5th Cir. 2004). Second, Bowdler and Dunlap are a couple who live together, have a child together, and are partners in concerted wrongdoing. Bank records show that Bowdler received investor funds from Meta1, but then commingled those funds in Meta1 bank accounts controlled by Dunlap. It is not possible to trace what happened to the money that

10

Bowdler received beyond that point, as Dunlap had a pattern of closing bank accounts and moving funds to new accounts.  [Hahn Dec. ¶ 27.]  Third, the Court has already ordered the Shamoon Relief Defendants to pay, jointly and severally, disgorgement of $7,457,998, with a remaining balance owed of $5,938,180.21.  [*See* Hahn Dec. at ¶ 26.]  Meta1 and Dunlap directed the actions of the Shamoon Relief Defendants, were partners with them in concerted wrongdoing, and are equally culpable for the fraudulent scheme.  *See Liu,* 140 S.Ct. at 1949. Thus, the amounts the Commission seeks reflect joint and several liability in various portions, as shown in the chart in paragraph II.12, above.

> ### 2. *Bowdler*

Bowdler personally received at least $1,540,679.48 in Meta1 investor funds.  [Hahn Dec. at ¶ 27.]  Bowdler ultimately deposited and commingled those funds in Meta1 bank accounts controlled by Dunlap and Meta1-related individuals.  [*Id.*]  It is not possible to trace what happened to the money Bowdler received beyond that point, as Dunlap had a pattern of closing bank accounts and moving funds to new accounts.  [*Id.*]  The Court should hold Meta1/Dunlap jointly and severally liable for the proceeds Bowdler received, because they were engaged in concerted wrongdoing.  *See Liu,* 140 S.Ct. at 1949.  The Commission calculated PJI at $133,365.03.  [Hahn Dec. ¶ 31, Ex. 3.]

> ### 3. *Warner Relief Defendants*

Based on a review of the bank records, the Warner Relief Defendants received at least $1,117,316.75 in investor funds after accounting for amounts transferred to Meta1 or affiliated entities.  From this total, the Commission deducted investor refunds ($54,908.12) and amounts paid to Schmidt ($5,000).  This left $1,057,408.63 of investor funds in their possession, to which they have no legitimate claim.  [Hahn Dec. at ¶ 29.]

Joint and several liability between the Warner Relief Defendants is appropriate because Traversie and Warner are a married couple who both control Ironheart, which is the bank account where investor funds are commingled.  Investor funds were commingled in accounts held in all three of their names.  Both individuals and the entity they control equally possess Meta1 investor funds and it is not possible to apportion amounts among them.  [*Id.*]

PJI on the amount of ill-gotten gains they have received is $91,531.90.  [*Id.* at 31, Ex. 3.]

**C.     The Court Should Order Schmidt to Pay Disgorgement and PJI in the Amounts Requested.**

Disgorgement against Schmidt, a securities law violator, is both necessary and proper. *See Manor Nursing,* 458 F.2d 1082 at 1104; *see also Sneed,* 2021 WL 4202171, at *10 ("Disgorgement is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs.") (internal quotations and citations omitted).  Schmidt admitted in his deposition that Dunlap paid him approximately $2,000 per month for six to seven months via online transfers or cashier's checks.  [Hahn Dec. at ¶ 28, Ex. 2 at 21:23-22:2, 22:22-24:25.]  He received $5,000 of investor funds from the Warner Relief Defendants, and another $19,210 from Meta1 and Dunlap.  [*Id.*]  This amount is a low approximation, because it does not include money he received from his workshops where he pitched Meta1 investors, as those amounts are unknown.[6]  [*Id.*]  PJI on his ill-gotten gains is $2,095.68.  [*Id.* at ¶31, Ex. 3]

**D.     The Court Should Impose Maximum Civil Penalties on the Defendants for their Illegal Conduct.**

The Securities Act and the Exchange Act both authorize courts to impose civil penalties,

---

[6]  Schmidt testified that he received between $2,000 and $5,000 for each workshop he hosted, and did them "about every three weeks."  [Hahn Dec. at Ex. 2. at 22:23-23:9.]  He testified that doing the workshops his income was "probably around maybe 60-$70,000," but he has not filed tax returns for 2018 or 2019.  [*Id.* at 23:6-23:16.]  The Commission did not include this amount in its requested disgorgement, because it cannot prove which workshops were related to Meta1.  However, as the Complaint makes clear, Schmidt hosted many workshops nationwide in order to lure people to invest in Meta1.  [*See, e.g.,* Compl. at ¶¶ 16, 71-73.]

and establish an escalating, three-tier structure for securities violations depending upon the egregiousness of the defendant's conduct and the losses (or risk of losses) to investors.  15 U.S.C. §77t(d); 15 U.S.C. §78u(d)(3), and 17 C.F.R. 201.1001 (increasing statutory amounts to reflect inflation).  These penalties are designed to punish individual violators and deter future violations of the securities laws, which is necessary because, without civil penalties, the only financial risk to violators is the forfeiture of their ill-gotten gains. *Voight,* 2021 WL 5181062, at *14 (quotations and citations omitted).

A third tier penalty, which is appropriate here, requires that the violation "involve fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and that "such violation directly or indirectly result in substantial losses or create a significant risk of substantial losses to other persons." *Id.*  The maximum civil penalty is the *greater* of the gross amount of pecuniary gain or the statutory maximum *per violation*.  15 U.S.C. § 78u(d)(3).  The maximum penalty amounts applicable here would be the amount of gross pecuniary gain to the Defaulting Defendants per violation, and $207,183 per violation for Schmidt.  *See* 15 U.S.C. §77t(d); 15 U.S.C. §78u(d)(3), and 17 C.F.R. 201.1001.  Although the statutory tier determines the maximum penalty allowed per violation, the actual amount of the penalty to be imposed is left to the Court's discretion.[7]  *See Voight,* 2021 WL 5181062, at *14 (citing *SEC v. Kern*, 425 F.3d 143, 153 (2nd Cir. 2005)).

The record of this case—including the allegations in the Complaint, which must be

---

[7]   The same factors the Court considers in determining whether to award injunctive relief are relevant in determining whether a civil penalty is appropriate and, if so, in what amount: "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; (5) whether the defendant has admitted wrongdoing; and (6) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." *SEC v. Life Partners Holdings, Inc.,* 71 F. Supp. 3d 615, 623 (W.D. Tex. 2014).

accepted as true—provides ample factual justification for imposing third-tier penalties of *at least* the amounts requested. Defendants' egregious and illegal actions caused investors worldwide to suffer a loss (or, at the very least, a risk of loss) of over $15 million in repeated, continuing violations.

Each of the Defendants engaged in contemptuous conduct resulting in this Court issuing arrest warrants as to Dunlap and Schmidt. The Defendants have filed documents with the Court rejecting its jurisdiction, claiming that the SEC is illegitimate, and threatening the Court and the SEC. [*See* Docs. 18, 27, 35, 42 (Schmidt's letter following the arrest warrant and contempt order attacking SEC counsel and accusing the Court of "malicious judicial misconduct.")]

Throughout the relevant period, Defendants engaged in repeated, egregious fraudulent conduct evidencing a high degree of scienter. At the most basic level, the investment they touted—the Meta1 Coin—did not actually exist. Instead, it was all a scam. [Compl. ¶ 81.] Schmidt and Dunlap repeatedly told listeners on internet radio shows that, among other things: (1) the Coin is "safe and secure" and protected from "government intervention;" (2) the Coin is based on asset value that will never drop, and cannot be sold for less than asset value; and (3) in two years, "50,000 a coin is going to be a very conservative value." [*Id.* at 77.] Dunlap currently offers and sells his pretend Coin for $377 each, and he represents to the public that Meta1 owns and backs its securities with $8.8 billion of gold—an absurd claim. Moreover, following each asset freeze issued in this case, Dunlap simply found other people to funnel investor funds through so that he could continue to steal from investors. [*See* Hahn Dec. at ¶¶ 6-10.]

Bowdler, a co-founder of Meta1, remains active in soliciting investors and creating the illusion that their Coin is real. Her LinkedIn page shows that she has been involved with Meta1

since the beginning. [*See* Hahn Dec., at Ex. 5.] She holds the titles of "Director of Business Development," and "Asset Management Specialist," and is responsible for "technical sales and relations within the market place." [*Id.*] She is the "client liaison and global ambassador for META 1 Coin." [*Id.*] In this role, she has solicited investors, telling them that they could get in on the ground floor before the initial public offering of the Coin, or "ICO." [Compl. ¶ 23] She knew, or was severely reckless in not knowing, that Meta1 had no actual plans, and no ability, to launch an ICO, and that Meta1 owned no assets to back the Coin. [*Id.* at 52.] Bowdler has also furthered the lie that Meta1 Coins are backed by $1 billion of fine art. [*See id.* at 61-62; Hahn Dec. at Ex. 4 (LinkedIn profile describing her role as "Developing relationships within the Fine Art community to ensure stability within our coin").]

Far from taking responsibility for her actions or acknowledging wrongdoing, Bowdler has actively resisted the SEC's pre-litigation investigations and its subsequent communications after filing this case. [*See* Order on Contempt, Doc. 39, at p. 2.] She willfully disregarded the Court's restraining order and orders requiring her to provide a sworn accounting of investor funds, among other orders. [*Id.* at 9.] The Court has already found her conduct in the litigation to be contemptuous. And although she received copies of all of the Court's orders on contempt [*see* Doc. 49], she continued to ignore the orders. As for her financial condition, she personally received over $1.5 million in investor funds that the SEC knows about, and as she lives with Dunlap, benefits from the millions he has misappropriated as well, so that factor weighs in favor of severe penalties.

As for Schmidt, the fact that it took his arrest to get him to appear for his deposition further demonstrates the egregiousness of his conduct.[8] His actions, as chronicled throughout

---

[8]  During his deposition, Schmidt repeatedly screamed at counsel when asked basic questions about what he told investors. [*See e.g.,* Hahn Dec., Ex.2 at 213:3-215:23.]

the Complaint, demonstrate a high degree of scienter, recurring continually until at least the

point that he signed the Consent decree.  His sworn deposition testimony revealed a lack of

understanding of his actions and the harm caused to investors, and gives no assurance that he is

done with Meta1.  For example, he testified that he would not talk about Meta1 to his audience

"until this stuff is cleared up."  [Hahn Dec., Ex. 2 at 234:1-24.]

Finally, Schmidt's current financial situation is unknown, but he has represented to the

Commission and to the Court that he has modest assets.  The SEC is unaware of his current

sources of income.  This factor is neutral, unless and until Schmidt provides evidence to

demonstrate his current financial condition.  Weighing all of the factors, the record supports

severe penalties, in at least the amount of his ill-gotten gains.  Maximum statutory penalties the

Court could impose are $207,183 per violation, of which there are countless, since every

misrepresentation to every investor and every offer of unregistered securities is a separate

securities violation.  The Court has discretion to impose severe penalties here.

For all the reasons stated above, as to each Defendant, the Court should impose severe

penalties in at least the amounts requested.

## IV.

## CONCLUSION

For the foregoing reasons, the Court should grant the Commission's motion in

fulland enter the attached order and proposed Final Judgments.

### CERTIFICATE OF SERVICE

I certify that on September 22, 2022, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all parties according to FED. R. CIV. P. 5(b)(2).

/s/ Jennifer D. Reece
Jennifer D. Reece