**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | § |
| | § |
| META 1 COIN TRUST, | § |
| ROBERT P. DUNLAP, individually and d/b/a | § Civil Action No.: 1:20-cv-273-RP |
| CLEAR INTERNATIONAL TRUST, | § |
| NICOLE BOWDLER, and DAVID A. SCHMIDT, | § |
| | § |
| Defendants, | § |
| | § |
| and | § |
| | § |
| PRAMANA CAPITAL, INC., | § |
| PETER K. SHAMOUN a/k/a PETER K. SHAMOON, | § |
| WANDA IRONHEART TRAVERSIE-WARNER, | § |
| ALFRED DEWITT WARNER JR. | § |
| AND IRONHEART TRUST, | § |
| | § |
| Relief Defendants. | § |

## DECLARATION OF CAROL HAHN

I, Carol Hahn, do hereby declare under penalty of perjury, in accordance with 28 U.S.C.
§1746, that the following is true and correct, and that I am competent to testify to the matters
stated herein.

1. I am currently employed as a Staff Accountant with the United States Securities
and Exchange Commission (the "Commission") in its Fort Worth Regional Office in Fort Worth,
Texas. I have been employed by the Commission since April 2005. I hold a B.S. in Economics
from Texas A&M University. I am a Certified Fraud Examiner. The facts set forth herein are

1

based upon my personal knowledge or upon information contained in the files of the Commission.

2.       As a Staff Accountant with the Commission, my responsibilities include, but are not limited to, analyzing financial records of non-public corporations, partnerships, limited liability companies, other entities, and individuals.  During the course of these responsibilities, I routinely trace financial transactions to determine how they occurred and their ultimate disposition, summarize that information and data into various schedules and charts, and testify to such at hearings and trials.

3.       As part of my official duties, I have been involved in the Commission investigation of, and subsequent litigation against, Defendants Meta1 Coin Trust ("Meta1"), Robert Dunlap ("Dunlap") individually and d/b/a Clear International Trust ("Clear"), Nicole Bowdler ("Bowdler"), and David Schmidt ("Schmidt") (collectively, "Defendants"), Relief Defendants Pramana Capital, Inc. ("Pramana") and Peter K. Shamoun a/k/a Peter K. Shamoon ("Shamoon") (together, "Shamoon Relief Defendants"), and Warner Relief Defendants Ironheart Trust ("Ironheart Trust"), Wanda Ironheart Traversie-Warner ("Traversie"), and Alfred Dewitt Warner Jr. ("Warner") (collectively, "Warner Relief Defendants"), to determine whether there have been violations of the federal securities laws in connection with the offer and sale of investment contracts in the form of a purported digital currency called the Meta 1 Coin ("the Coin").

## Meta1 Continues to Raise Investor Funds

4.       Dunlap and Meta1 continue to operate and market the investment scheme through various means, including its website (https://meta1coin.vision), social media,[1] Zoom calls with

---

[1]   Meta1's LinkedIn page states that Meta1 "provide[s] the liquidity of gold."

investors and prospective investors, in-person seminars, and on an internet radio show (https://www.thejimpriceshow.com).  Meta1's current White Paper now claims that the Meta1 Coin is backed by $8.8 billion in gold assets (up from $2 billion claimed gold assets in March 2020).  By comparison, the current reported value of United States Treasury-owned gold held in reserve at Fort Knox is approximately $6.2 billion.  *See* Status Report of Gold Reserve, available at *https://fiscaldata.treasury.gov/datasets/status-report-government-gold-reserve/u-s-treasury-owned-gold*.  Meta1 continues to falsely claim that it is free from U.S. government oversight.

5.      As recently as September 12, 2022, Meta1/Dunlap sent an email blast to investors and prospective investors inviting them to join the Meta1 "Executive Team" at a "Meta1 Workshop" to be held in Las Vegas, NV on September 24, 2022.  The email featured Dunlap as a speaker at the event, and listed the "current value" of the Meta1 Coin at $377.  It originally sold for $22.22.  A true and correct copy of the email sent to investors is attached hereto as **Exhibit 1.**

6.      Dunlap continues to operate the Meta1 scheme through various Meta1 associates. From the start of the scheme through March 16, 2020, when the Court entered its temporary restraining order and imposed an asset freeze [Doc. 8] (the "Initial TRO"), a significant portion of the Meta1 investor proceeds were sent or deposited into accounts controlled by the Shamoon Relief Defendants, as previously outlined in my declarations dated March 13, 2020 [Doc. 3-2] and May 14, 2020 [Doc. 53-1].

7.      Following the Initial TRO, the Commission discovered $1,317,261 in uncashed Meta1 investor checks in Shamoon's possession.  That amount was not included in the agreed-upon disgorgement amount of $7,457,998 ordered by the Court against the Shamoon Relief Defendants on February 3, 2021 [Doc. 113 (Agreed Final Judgment)].  Shamoon has paid

$1,519,817.79 of that amount.  Approximately $1.4 million of that was turned over from frozen accounts.

8.      After the Court froze Shamoon's accounts, Meta1 investor funds were directed to accounts controlled by the Warner Relief Defendants, as set forth in my declaration dated May 14, 2020 [Doc. 53-1] in support of the Commission's application for an asset freeze in connection with its Amended Complaint.

9.      After the Court froze the Warner Relief Defendants' accounts [Doc. 54], Meta1 investor funds were directed to accounts controlled by Meta1 board member Richard Grassie ("Grassie").[2]

### Bank Record Analysis

10.     As part of my official duties in this case, I have reviewed and analyzed bank records and other documents to determine the sources and use of funds in connection with the Defendants' efforts to raise money from investors through the offer and sale of the Coin. Following the flow of funds, the Commission obtained, and I reviewed, bank records for accounts controlled by Grassie.  Grassie continued a pattern established by Meta1 and Dunlap: open and use a bank account for a short period of time, deposit investor funds, spend investor funds on purposes not disclosed to investors, including the withdrawing of investor funds using cashier's checks to pay other related third parties, and then open a new bank account at a different bank to repeat the process again.

11.     I reviewed accounts held in the name of Grassie at Arvest Bank, U.S. Bank, N.A. ("U.S. Bank"), JPMorgan Chase Bank, N.A. ("JPM Chase"), Navy Federal Credit Union

---

[2] Grassie was listed in at least one version of Meta1's whitepaper as a board member.

("NFCU"), Regions Bank, and Wells Fargo Bank, N.A. ("Wells Fargo") (collectively, "Grassie Bank Accounts").[3] Those accounts are as follows:

| Bank Name | Account Name | Account No. (Last 4 Digits) | Date Opened |
|---|---|---|---|
| Wells Fargo | Richard T Grassie | -7375 | 6/26/2018 |
| U.S. Bank | Richard Thomas Grassie | -4370 | Unknown |
| NFCU | Richard T Grassie | -1588 | 04/2020[4] |
| JPM Chase | Richard T Grassie | -7780 | 7/14/2020 |
| Regions Bank | Richard T Grassie | -7219 | 4/27/2021 |
| Arvest Bank | Richard Thomas Grassie | -1476 | 4/29/2021 |

12.     The Commission obtained, and I also reviewed records for accounts controlled by Grassie held at Paypal Holdings, Inc. ("Paypal"), Coinbase, Inc., American Express, and Capital One, N.A.

13.     Coinbase, Inc. ("Coinbase") is an online platform for buying selling, transferring, and storing cryptocurrencies.  Grassie appeared to be operating his Coinbase account like a pass-thru account where he would transfer money in from his bank accounts, convert to a cryptocurrency and send out to various crypto wallets owned by unknown individuals/entities. He would also receive cryptocurrencies in, convert to USD, and then transfer to his bank accounts.

14.     In total, from May 2020 to December 2021,[5] the Grassie Bank Accounts received at least $3,366,411 in Meta1 investor funds or potential Meta1 investor funds from at least 300

---

[3] Grassie also took out a mortgage loan with Citizens Bank that he defaulted on for a property at 16623 Wheat Mill Lane, Houston, TX 77095. I am also aware that Grassie has accounts at other financial institutions but the Commission has not obtained records for those accounts.

[4] Account opening documents provided by NFCU were illegible.  April 2020 is the first statement date provided by the bank.

[5] This includes funds obtained through Paypal and Coinbase.

investors located across the U.S. and from Canada, Australia, New Zealand, and Germany. Investors used wire transfers, cashier's checks, money orders, and checks made out to Grassie to make their investments.  The memo descriptions on some of these investments include such statements as "Meta 1 certificate," "Meta 1 coin," "Investment," "Gold investment," and "purchase of stock."

15.     The Grassie Bank Accounts had a combined account balance of $38,003.28 as of December 2021.[6]

16.      After Meta1 investor funds are deposited into the Grassie Bank Accounts, Grassie generally distributes the investor funds as follows: he pays other Meta1-related individuals, including Penny Cummings (employee), Kevin Job (board member), Marianne O'Malley (employee), the Warner Relief Defendants, Justin Morris (Meta1's COO), Suzanne Bertolas (employee), and Ioana Dragan (affiliated with Shamoon), and companies, including Artheas Progeny Trust (Kevin Job Trustee), he pays bills including credit card and loan payments, and he withdraws cash as cashier's checks made payable to himself and other Meta1 employees.  The bank records also show a number of payments and wire transfers to unknown individuals.

17.     The investor funds that went to third party companies were then, in part, transferred back and forth between these company accounts and Grassie's accounts, transferred or wired to other entities, used to pay Meta1-related individuals and other expenses of the companies, including rent.  I also reviewed Grassie's credit card statements which were paid with Meta1 investor funds and found that expenses were both personal and potentially related to Meta1 expenses, with the majority of funds spent on marketing services.

---

[6] For certain of the Grassie Bank Accounts, the ending balances were prior to December 31, 2021.

18.     During this same period, Meta1 (through Grassie) issued refunds to investors from the Grassie Bank Accounts in a total amount of $138,556.

19.     In addition to Grassie, Meta1 investors sent their investments to Meta1 employee Penny Cummings.  The Commission obtained, and I reviewed records for accounts controlled by Cummings at USAA Federal Savings Bank.  Cummings received at least $230,000 from three Meta1 investors.  In addition to Cummings receiving Meta1 investor funds directly, she also received $416,813 of investor funds from the Grassie Bank Accounts.

### Updated Amount of Investor Funds Raised and Investor Totals

20.     Based on my review of updated Meta1 bank records, Warner Relief Defendants account records, Shamoon Relief Defendants account records, Grassie Bank Accounts, and the Cummings accounts, between April 1, 2018 and December 31, 2021, Meta1 raised at least $15,250,847.22 from at least 800 investors in 40 states and 8 foreign countries.[7]

21.     Neither Dunlap and his entities, nor Bowdler, nor the Warner Relief Defendants produced any kind of accounting, as the Court ordered them to do.  Thus, the Commission's calculations are reasonably approximate, based on the information available to it through subpoena responses from known third parties.

### Use of Investor Proceeds

22.     To calculate the total amount of disgorgement among all of the parties, I started with the total amount of investor funds raised of $15,250,847.22, and subtracted $1,317,260.86 in uncashed investor checks and $482,373.47 in investor returns.  The total amount of ill-gotten gains realized among the parties is $13,451,212.89.

23.     The Meta1 investor funds were commingled in the accounts and spent as follows:

---

[7] This includes $1,317,260.86 in uncashed Meta1 investor checks received by Shamoon.

| Overall Use of Investor Funds | |
|---|---|
| **Item Description / Entity Name** | **Total Spent** |
| Shamoon Controlled Accounts | $7,457,998 |
| Individuals/Entities (affiliated with Meta1/Shamoon) | $2,422,436 |
| Personal Expenses/Other | $1,496,392 |
| Individuals/Entities (unknown association/purpose) | $516,405 |
| Withdrawals (unknown reasons) | $497,985 |
| Credit Card & Loan Payments | $398,859 |
| Unknown Use | $389,938 |
| Coinbase Inc. | $271,200 |
| **Total** | **$13,451,213** |

## Disgorgement and Prejudgment Interest Calculations

24.     As part of my analysis, I calculated the Defendants' and Werner Relief Defendants' reasonably approximate disgorgement in connection with the Coin offering.  To arrive at the disgorgement amount, I started with the amount of known investor funds they received and deducted any refunds to investors or uncashed checks.

25.     Meta1 and Dunlap, either directly or indirectly, through accounts Dunlap and others controlled, including Shamoon, Grassie, and Cummings, received at least $14,133,530.47 in investor funds.  Meta1 and Dunlap acted together as one economic unit, commingling investor funds and using them as one account.  From the total amount raised, I subtracted $1,519,817.79 paid back by Shamoon, $1,317,260.86 in uncashed checks, $427,465.35 in investor refunds, and $19,210 paid to Schmidt leaving a total disgorgement of $10,849,776.47.  From this amount, $3,370,916.78 is owed by Meta1 jointly and severally with Dunlap, $5,938,180.21 is owed jointly and severally between Meta1, Dunlap and the Shamoon Relief Defendants, and $1,540,679.48 is owed jointly and severally between Meta1, Dunlap and Bowdler.

26.     The Shamoon Relief Defendants jointly and severally with Meta1 and Dunlap originally owed $7,457,998 in disgorgement; however, Shamoon paid $1,519,817.79 of that

amount (which I subtracted) leaving $5,938,180.21 still owed.

27.     Bowdler received at least $1,540,679.48 in Meta1 investor funds.  Bowdler

ultimately deposited and commingled most of those funds in Meta1 bank accounts controlled by

Dunlap and Meta1-related individuals.  It is not possible to trace what happened to the money

Bowdler received beyond that point, as Dunlap had a pattern of closing bank accounts and

moving funds to new accounts.

28.     A true and correct copy of portions of Schmidt's deposition transcript is attached

hereto as **Exhibit 2**.  Schmidt admitted in his deposition that Dunlap paid him approximately

$2,000 per month for six to seven months via online transfers or cashier's checks.  He received

$5,000 of investor funds from the Warner Relief Defendants, and another $19,210 from Meta1

and Dunlap.  This amount is a low approximation, because it does not include money he received

from his workshops where he pitched Meta1 investors, as those amounts are unknown.

29.     The Warner Relief Defendants received at least $1,117,316.75 in investor funds

after accounting for amounts transferred to Meta1 or affiliated entities that is included under

Meta1 and Dunlap above.  From this amount I subtracted out investor refunds ($54,908.12) and

amounts paid to Schmidt ($5,000).  This left $1,057,408.63 of investor funds in their possession,

to which they have no legitimate claim.  Traversie and Warner are a married couple who both

control Ironheart, and investor funds were commingled in accounts held in all three of their

names.  Both individuals and the entity they control equally possess Meta1 investor funds, and it

is not possible to apportion amounts among them.

30.     To calculate prejudgment interest ("PJI") on the Commission's calculated

disgorgement amounts, I used a prejudgment interest calculator.  This calculator uses an annual

interest rate based on the rate used by the Internal Revenue Service to calculate underpayment

penalties.[8]   **Exhibit 3** attached to this Declaration reflects the calculator's prejudgment interest calculations for the Defendants and Relief Defendants for the period beginning March 16, 2020 through September 1, 2022.

31.     In summary, the disgorgement amounts and prejudgment interest calculations are summarized in the chart below, along with requested civil penalty amounts:

| Party | Disgorgement | PJI | Penalty | Total |
|---|---|---|---|---|
| **Meta1** and **Dunlap,** jointly and severally | **$10,849,776.47** | $939,183.45 | $10,849,776.47 | $22,638,736.39 |
| Of that total disgorgement: | | | | |
| **Meta1** and **Dunlap,** jointly and severally | $3,370,916.78 | $291,794.87 | | |
| **Meta1/Dunlap,** jointly and severally with Shamoon Relief Defendants | $5,938,180.21[9] | $514,023.55 | | |
| Meta1/Dunlap jointly and severally with **Bowdler** | $1,540,679.48 | $133,365.03 | | |
| **Bowdler,** jointly and severally with Meta1/Dunlap | **$1,540,679.48** | $133,365.03 | $1,540,679.48 (individual penalty) | $3,214,723.99 |
| **Schmidt** | **$24,210.00** | $2,095.68 | $24,210.00 | $50,515.68 |
| **Warner Relief Defendants,** jointly and severally | **$1,057,408.63** | $91,531.90 | N/A | $1,148,940.53 |

32.     A true and correct copy of a Meta1 "news alert" sent via email blast on June 13, 2022 is attached hereto as **Exhibit 4.**

---

[8]   That rate is defined as the Federal short term rate plus three percentage points. *See* 26 U.S.C. § 6621(a)(2).

[9]   This amount excludes the amount the Commission has collected from the Shamoon Relief Defendants.

33.     True and correct copies of screen prints of the LinkedIn pages of Meta1 and Nicole Bowdler are attached hereto as **Exhibit 5.**  Although Bowdler's LinkedIn page lists her name as "Nicole M.," the photo image of her is identical to the photo of Bowdler on Meta1's Whitepaper (also attached hereto as part of Exhibit 5), and her middle name is Marie.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 21, 2022

_____
Carol Hahn



**EXHIBIT**

**1**







META 1 is on the Verge of Expanding Globally!

**We are set to launch METANOMICS Version 1.0**

With that on the horizon, and with the onset of another Asset Assignment, once again the META Executive Team is extending our outreach to meet with our members in person.

There is nothing better than face to face interaction and sharing the Incredible energy created when META 1 members join together in one location.





## Event Details

Saturday September 24, 2022
9am - 4:30pm
Free Admission

## Venue Location

Hampton Inn & Suites Las Vegas Convention
755 Sierra Vista Dr .
Las Vegas
89169
USA



# META 1 SPEAKERS

 

### Robert P. Dunlap
META 1 Coin Trust Executive Trustee

### DOC
Co-Director of Member Relations

Executive Team Members will share the META 1 Concept and Insight into why there needs to be a Big Change and Shift in Financial Evaluation. With the very public and recent volatility in the Crypto space, there is no better time than right now to Secure your Financial Freedom.

Our conference is always Exciting, Informative, and Interactive. This is a great opportunity to hear the latest news, face to face with our Executive Team.





# DOOR PRIZES AND RAFFLES

Be sure to purchase Raffle Tickets at the door for a chance to win FREE Merchandise and a META 1 Coin (current Value $377+ USD)

# LUNCH

Refreshments tea/coffee and snacks will be provided for our guests.



LightGear.io

## META 1 Apparel and Household Goods

**BUY NOW**





Have a Question?

**928-494-0976**

Member Support

**memberservices@meta1coin.vision**

Home   About   Exchange   Contact Us

META 1 Coin Trust All Rights Reserved 2021-2022

Répondre, Répondre à tous ou Transmettre

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE WESTERN DISTRICT OF TEXAS
 3                AUSTIN DIVISION
 4
 5  SECURITIES AND EXCHANGE COMMISSION,    ) Civil Action No.
                                          ) 1:20-cv-273-RP
 6          Plaintiff,                     )
                                          )
 7  v.                                     )
                                          )
 8  META 1 COIN TRUST,                     )
    ROBERT P. DUNLAP, individually and d/b/a )
 9    CLEAR INTERNATIONAL TRUST,           )
    NICOLE BOWDLER, and DAVID A. SCHMIDT,  )
10                                         )
          Defendants,                      )
11                                         )
          and                              )
12                                         )
    PRAMANA CAPITAL, INC.,                 )
13  PETER K. SHAMOUN a/k/a PETER K. SHAMOON, )
    WANDA IRONHEART TRAVERSIE-WARNER,      )
14  ALFRED DEWITT WARNER JR., and          )
    IRONHEART TRUST,                       )
15                                         )
          Relief Defendants.    )
16  _____)
17
18
19        VIDEO DEPOSITION OF DAVID ALAN SCHMIDT
20                VIA VIDEOCONFERENCE
21            Wednesday, August 12, 2020
22
23
    Reported by:
24  Marcia S. McEntee
    CSR No.  13399
25  Job No.  200812MSM
```

**Page 2**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE WESTERN DISTRICT OF TEXAS
 3                AUSTIN DIVISION
 4  SECURITIES AND EXCHANGE COMMISSION,    ) Civil Action No.
                                          ) 1:20-cv-273-RP
 5          Plaintiff,                     )
                                          )
 6  v.                                     )
                                          )
 7  META 1 COIN TRUST,                     )
    ROBERT P. DUNLAP, individually and d/b/a )
 8    CLEAR INTERNATIONAL TRUST,           )
    NICOLE BOWDLER, and DAVID A. SCHMIDT,  )
 9                                         )
          Defendants,                      )
10                                         )
          and                              )
11                                         )
    PRAMANA CAPITAL, INC.,                 )
12  PETER K. SHAMOUN a/k/a PETER K. SHAMOON, )
    WANDA IRONHEART TRAVERSIE-WARNER,      )
13  ALFRED DEWITT WARNER JR., and          )
    IRONHEART TRUST,                       )
14                                         )
          Relief Defendants.    )
15  _____)
16
17
18        Video deposition of DAVID ALAN SCHMIDT,
19  taken on behalf of Plaintiff in Sedona, Arizona,
20  beginning at 8:07 a.m. PDT and ending at 2:03 p.m. PDT,
21  on Wednesday, August 12, 2020, all parties appearing
22  remotely via WebEx videoconference, before Marcia S.
23  McEntee, Certified Shorthand Reporter No. 13399.
24
25
```

**Page 3**

```
 1  APPEARANCES:
 2
 3  For Plaintiff SEC:
        UNITED STATES SECURITIES AND EXCHANGE COMMISSION
 4      BY:  JENNIFER D. REECE, ESQ.
        Burnett Plaza, Suite 1900
 5      801 Cherry Street, Unit 18
        Fort Worth, Texas  76102
 6      817-978-6442
        reecej@sec.gov
 7
    For Defendant David A. Schmidt:
 8      -- IN PRO PER --
        DAVID ALAN SCHMIDT
 9      2519 North Ocean Boulevard, Number 413
        Boca Raton, Florida  33431
10      928-254-0287
        daveschmidt@msn.com
11
12  For Relief Defendants Pramana Capital and Peter Shamoun:
13      SHEPPARD, MULLIN, RICHTER & HAMPTON
        BY:  JOSEPH JAY, ESQ.
14      2099 Pennsylvania Avenue, NW, Suite 100
        Washington DC 20006
15      202-747-1900
        jjay@sheppardmullin.com
16
17  Also Present:
18      James Etri
        Angela Stewart
19
    Videographer:
20
        Daniel Ortega
21
22
23
24
25
```

**Page 4**

```
 1                    INDEX
 2  WITNESS                EXAMINATION
 3  DAVID ALAN SCHMIDT
 4      BY MS. REECE                  8
 5      BY MR. JAY                  239
 6
 7                  EXHIBITS
 8  EXHIBIT NO.       DESCRIPTION          PAGE
 9  Exhibit 1  Investigative subpoena dated 7/31/19   78
        Exhibit 2   Meta 1 Coin white paper       84
10  Exhibit 3  10/3/18, Sedona Connection radio show  132
        transcript
11  Exhibit 4  4/24/19, Sedona Connection Radio Show  168
        transcript
12  Exhibit 5  10/9 program transcript        176
        Exhibit 6  11/6/19, radio program transcript  191
13  Exhibit 7  1/15/20, radio program transcript  194
        Exhibit 8  1/29/20, Blog Talk radio program  199
14      transcript
    Exhibit 9  2/12/2020, radio program transcript  205
15  Exhibit 10  Temporary Restraining Order and other  220
        and other orders entered 3/16/20
16  Exhibit 11  3/24/2020, newsletter      223
        Exhibit 12  Notice of Nonconsent 3/24/20    226
17  Exhibit 13  4/1 Cosmic Connection Blog Talk   227
        transcript
18  Exhibit 14  Order in contempt issued 4/21/20   232
    Exhibit 15  Letter witness wrote to Judge Pitman  235
19      filed in Court 4/14/2020
20
21
22
23
24
25
```

**EXHIBIT**

**2**

1    Q  But your hesitating on that.  Do you --
2    A  Well, I have some money that I invested in Meta 1
3 Coin --
4    Q  Oh.
5    A  -- that has a cash value of about $6,300.  So
6 that would be my other financial account.
7       But those four bank accounts, the two brokerage
8 accounts, and the Meta 1 account, that is the total sum of
9 all of my financial assets.
10    Q  Okay.  So you had $6,300, you said.  Is that the
11 amount that you've invested in Meta 1 Coin?
12    A  Yes.  That is what I -- what I call the "cash
13 value."
14    Q  Okay.  Do you know any of the accounts where
15 Meta 1 investor money is located?
16    A  No.
17    Q  Do you have control over any of those accounts?
18    A  None whatsoever.
19    Q  Did investor funds that you know of ever go into
20 your account?
21    A  No.
22    Q  Do you own a home?
23    A  I have received no money from Meta 1 whatsoever.
24    Q  Okay.  We'll talk about that in a little bit, the
25 distinction, because you have received money from

21

1 Robert Dunlap; correct?
2    A  Yes.
3    Q  Okay.  And have you received money from any other
4 entity that Robert Dunlap is related to?
5    A  No.
6    Q  So you received money from Clear International
7 Trust?
8    A  No.
9    Q  Okay.  And we'll talk about the details of that
10 in a minute.
11       Do you own a car?
12    A  Yes.
13    Q  What kind of car?
14    A  A 2012 Kia Sorento.
15    Q  And do you own a home?
16    A  No.
17    Q  Any other assets do you own that are valued over
18 a thousand dollars?
19    A  Honda Gold Wing motorcycle.
20    Q  Anything else?
21    A  No.
22    Q  What is your annual income?  Or monthly, if it is
23 easier?
24    A  Well, it was depending.  See, when I was doing my
25 workshops, you know, a couple years ago, I was receiving

22

1 3- to $5,000 from each one, but that went down to only
2 receiving about 2,000.  But I haven't done a workshop now
3 in five months.  I used to do them about every three
4 weeks.  So without doing the workshops, my annual income
5 is only around $24,000 a year.
6    Q  And in 2019 before COVID and you were unable to
7 do the workshops, what would you say your annual income
8 was?
9    A  Probably around maybe 60- to 70,000.
10    Q  Did you file a tax return?
11    A  I haven't yet.  I haven't filed an '18 or '19 tax
12 return.
13    Q  Why haven't you?
14    A  Because I don't owe anything, so I just haven't.
15    Q  Do you intend to?
16    A  Yes.
17    Q  So let's talk about the money that you received
18 from Robert Dunlap.  I think you told the Court that you
19 currently receive a monthly amount from him; is that
20 correct?
21    A  I was receiving $2,000 a month from him for
22 probably about six to seven months.  And that was to help
23 subsidize my living expenses.
24    Q  And did you perform work for him?
25    A  No.

23

1    Q  So that was just -- he just gave you that money
2 for nothing?
3    A  Yes, yeah, yeah.  Well, I mean I moved to Florida
4 to basically be near him again, so other reasons that are
5 there.  And my living expenses in Florida went up over
6 two thousand to two and a half thousand dollars a month
7 when I was living in Sedona.
8    Q  How -- how is it paid -- how does he pay you the
9 $2,000 a month --
10    A  The first two or three months, it was basically
11 an online transfer, and after that it was a cashier's
12 check.
13    Q  When is the last time you were paid from him?
14    A  Would have been in -- let's see -- April -- April
15 or May.
16    Q  And how did he -- how did you get paid?  In a
17 cashier's check?
18    A  It was a cashier's check, yeah.  Yes.
19    Q  Do you know what account he paid you from?
20    A  No.
21    Q  Do you know what Mr. Dunlap's sources of income
22 are?
23    A  All I know is he is a master market trader, and
24 he makes a lot of money trading markets.  He is very, very
25 good at it.  That is what I know.

24

David Schmidt
8/12/2020

1  operation.
2   Q   That is not what he said.
3       You said -- you asked the question, "How many
4  people are you looking to hire within the next two
5  months?"  Nothing about "public."
6   A   That is -- he's not going to hire 200 people
7  right now when the coin isn't even public, and it can't --
8  and they can't move a lot.  That is common sense.
9   Q   He told investors they --
10  A   That was his intention --
11  Q   -- would.  So when you told investors that, that
12  was just false?
13  A   Jennifer, put your common-sense hat on.
14  Q   It's on.
15  A   Bad question.
16      No, it's not.  You're making insinuations that
17  are -- that are inaccurate.
18      He's telling people -- I mean, it's in
19  black-and-white, and it's also on audio -- that he will be
20  hiring 200 people, most of them -- a lot of them from your
21  listeners.  He says they seem like ideal candidates.  I
22  don't know how he knows that, but seem like ideal
23  candidates in the next two months, and that was --
24  A   Yes.
25  Q   -- true.

213

1   A   -- and -- and we already talked about -- we had
2  already talked about that in a previous conversation, and
3  it's about potentially doing that when the coin was going
4  to go public.
5   Q   And you did --
6   A   And wasn't able to do that.
7   Q   You didn't tell that to investors?
8   A   What does this have to do with a legal document
9  before a court?  That is an opinion issue.
10  Q   What?
11  A   This feels like an entrapment question from
12  you --
13  Q   I don't --
14  A   I want to be very direct with that.
15  Q   Simple --
16  A   It's like you're trying to entrap me in something
17  that has no legal basis whatsoever.  So let's get back to
18  the factual questions.
19  Q   I'm talking about factual questions, what you
20  told investors.  You did not tell investors that he was
21  going to hire 200 --
22  A   Jennifer, drop it.  Drop it.  Drop it.
23  Q   Don't scream at me.  You can lower your voice and
24  behave.
25  A   I will scream at you if I want to scream at you.

214

1  And -- fucking file charges against you for what you've
2  done against me if you keep this up.
3   Q   You need to calm down.
4   A   You flat-out -- a million dollars, an absolute
5  flat-out lie.  I can bring criminal charges against you if
6  I want to for what you've done to me.
7   Q   What kind of charges do you --
8   A   Let's come back to the factual questions.
9   Q   Okay.  You need to calm down and stop cussing.
10  A   How do you -- I will say what I want to say.  You
11  don't just tell me what I can say.  Okay.
12  Q   Please calm down.  I'm asking you to calm down
13  because --
14  A   You're the one who is going to be on the
15  defensive.  You're going to have to define for a judge why
16  you accused me of stealing a million dollars when you have
17  absolutely no facts for that.  How are you going to
18  explain that before a judge?
19  Q   I --
20  A   I can't hear you.
21  Q   I simply asked you to stop screaming and to calm
22  down.
23  A   Okay.  I will be calm.
24      You're the one who is going to have to explain
25  for a judge why you accused me of stealing a million

215

1  dollars when you have absolutely no facts whatsoever, and
2  I testified here that I had none of that money.  I've
3  never received a dime of that money.
4   Q   Okay --
5   A   And you knew that back in my statement back in
6  April that I had nothing when I made that statement in
7  that -- in that radio program that I had that I never
8  received a dime from Meta 1.
9      You knew it all the way back then, but you still
10  filed these charges against me.  And you're still trying
11  to hold to them.  What is your facts?  What is -- what is
12  your truth that I did any of that?  You don't have any.
13      You're going to be the one that is going to have
14  to answer that before a judge, not me.
15  Q   I'm fine with that.  You and I have differing
16  opinions on that.  And I will be happy to show you the
17  evidence, which by the way, are you planning on
18  participating in this lawsuit since you've not filed an
19  answer?
20  A   What lawsuit?
21  Q   The lawsuit that you're here testifying in, the
22  one that was filed in Federal Court against you.
23  A   I will talk to my counsel about that -- what I
24  will do.
25  Q   Who is your counsel?

216

1    **A**   I'm not telling you my counsel at this time.
2 First of all, I don't know yet. I'm in the process of
3 acquiring counsel.
4    **Q**   Okay. But as you sit here today, you're not
5 represented by any counsel?
6    **A**   I'm in the process of acquiring counsel.
7    **Q**   But, again, to answer the question, currently you
8 are not represented by counsel?
9    **A**   No, not currently.
10    **Q**   Okay.
11    **A**   I can't hear you. You didn't come through.
12    Okay. So go to page 67 of Exhibit 9. Caller
13 comes in and asks you and Mr. Dunlap -- he says, "Dave and
14 Robert, the assets are backed today by about two billion;
15 is that correct?"
16    And Dunlap says, "Yes, right now."
17    And the caller says, What sorts of distribution
18 are the types of asset? Gold, silver, real estate, fine
19 art, gold mining, stock? What is the spread on the
20 portfolio of the assets that back the coin?"
21    And Mr. Dunlap says, "So right now Article 5, you
22 have to have 6 percent of metal in vault for your
23 issuance, and we are falling within that standard."
24    The caller says, "Physical metals?"
25    He says, "Yes."

217

1    And you say, "But as far as standard, it's pretty
2 close to the highest standard you can get for having your
3 assets verified."
4    And then he goes on, says some other stuff and
5 basically answers the question with, "All gold,
6 100 percent gold."
7    So what -- what did you mean when you said that?
8 Your response to the caller was what? Explain --
9    **A**   I --
10    **Q**   -- that.
11    **A**   -- don't know. I'd have to -- I -- I don't know.
12 I don't know how to answer.
13    **Q**   Well --
14    **A**   I don't know how to answer that question. I
15 don't know what I meant by that.
16    **Q**   Okay. So as you sit here today, do you have any
17 understanding of, like, what standard you're talking
18 about, what this Article 5 is?
19    **A**   Well, my understanding of the standard is,
20 again -- is in the independent auditing firm, third-party
21 independent audit. That is the standard. That is how I
22 recall it.
23    **Q**   Okay. So at this point you're telling investors
24 in February of 2020 that the one -- the $2 billion in
25 assets is 100 percent in gold. I guess that's it; right?

218

1    **A**   I -- I didn't say that. That is what Mr. Dunlap
2 said.
3    **Q**   Okay. But you agreed with it?
4    **A**   That was his statement.
5    MS. REECE: Okay. You can close that out.
6    So I want to talk a little bit about the
7 temporary restraining order that was entered in this case.
8    Oh, you know what? Before we do that, let's go
9 off the record.
10    Are we off the record?
11    THE VIDEOGRAPHER: The time is now 1:12 p.m. We
12 are off the record.
13    (A brief recess was taken.)
14    THE VIDEOGRAPHER: The time is now 1:26 p.m.
15 We're back on the record.
16    MS. REECE: Okay. Let me show you --
17    (Deposition was interrupted.)
18    MS. REECE: All right. Okay. I'm going to show
19 you what we've marked as Exhibit 10, and I'm sure you've
20 seen it before. I will show you on the screen.
21    That -- okay. Exhibit 10 is the temporary
22 restraining order and other orders that were entered in
23 this case on March 16th, 2020, and it is Document Number 8
24 on the Court's docket.
25    Do you recognize this document?

219

1    THE WITNESS: Yes. Vaguely.
2    (Plaintiff's Exhibit 10 was marked for
3    identification.)
4 BY MS. REECE:
5    **Q**   Well, have you read it?
6    **A**   Well, I read it back when it came through but not
7 recently.
8    **Q**   Well, you understand that there are several
9 provisions in here that you're required to comply with;
10 correct?
11    **A**   Yeah. I will do that now.
12    **Q**   Okay. So I just want to kind of skip down to the
13 section -- the paragraph on accounting. Hold on one
14 second.
15    MS. REECE: Angela, can you mute? I'm having
16 some technical issues. All right. I don't know what is
17 going on, but. Okay.
18 BY MS. REECE:
19    **Q**   Let's look at the accounting provision paragraph
20 12, which is page 14 of this document. Have you seen this
21 before?
22    **A**   Yes.
23    **Q**   And you will see that if you read the second
24 sentence, that you're required to file a sworn accounting.
25 Actually, start at the first sentence. It says that you

220

1  parts of the Court's order requires you to take down some
2  of the statements that you have made that are publicly
3  available regarding Meta 1?
4      A   Show me where they are, so I can take them down.
5  I don't know which ones those would be.
6      Q   Well, I mean we just went through a few of them,
7  the further exhibits, that audio files that -- where
8  you're talking with Mr. Dunlap --
9      A   Okay.
10     Q   -- promoting --
11     A   I will go back.  Now, all right.  I can't access
12  that program here because it has a password that I can't
13  remember what it is.  I will be able to do that when
14  I get to the computer at home, and I will just -- I will
15  work on it.
16     Q   Okay.  Did you talk to Mr. Dunlap about the
17  contempt order before you were actually arrested?
18     A   Briefly, yes.
19     Q   What did you say?
20     A   I don't recall what I said.  Just the fact that,
21  you know, we didn't know if it is -- I mean I took his
22  lead.  He was the one that said that he didn't want to
23  show up.  And I was not in a position to go against him at
24  the time.
25         And looking back, I should have been responsible

233

1  for myself.  And, you know, this is where I've, you know,
2  made, you know, change to my position on it because I'm
3  not working with Meta 1 on this issue.  It's just me here
4  now.
5         And so, you know, I was surprised it took five
6  weeks from the time that Judge Pitman put the order out
7  before they arrested -- I was under the impression it
8  wasn't going to seriously happen because it had taken so
9  long.
10     Q   Do -- so you said you're not working with Meta 1
11  anymore.  Are you saying now that you're not going to talk
12  about Meta 1 at any point?
13     A   Not until this stuff is cleared up.
14     Q   Okay.  So you're not actively -- right now you're
15  not actively encouraging your listeners to go out and
16  invest in Meta 1 Coin?
17     A   No.  I'm saying -- I basically -- I mean you can
18  go back and listen to my last three or four programs.  I
19  say, "Folks, I'm not talking about Meta 1.  I'm not going
20  to talk about that until this issue is cleared up.  People
21  need to make their own decisions what they are going to
22  do, but I'm not telling you to go do anything."
23         I'm staying away from it until this is cleared
24  up.
25     Q   Okay.  And, then, there is another thing I'm

234

1  going to show you.  I'm going to show you what we've
2  marked as Exhibit 15, and this is a letter that you wrote
3  to Judge Pitman.  Looks like it was filed by the Court on
4  April 14th, 2020, and it is Document 42 on the Court's
5  docket.
6         Do you recognize this document?
7      A   Yes.
8      Q   Okay.  And what is this?
9      A   This was a statement that I had put together at
10  that time in conjunction with Mr. Dunlap.
11         (Plaintiff's Exhibit 15 was marked for
12         identification.)
13         MS. REECE:  Who drafted this document?
14         THE WITNESS:  I was the one that drafted it
15  originally, and Mr. Dunlap did some --
16         THE COURT REPORTER:  I'm sorry?  "Mr. Dunlap"
17  what?
18         THE WITNESS:  Did some editing on the document.
19         MS. REECE:  "Editing."
20         THE WITNESS:  Yes, that is "editing."
21  BY MS. REECE:
22     Q   Okay.  And that is your signature right there?
23     A   Yes.
24         And that is when I was still in the state, that
25  I was -- the time I was taking -- still following his

235

1  lead.
2      Q   Okay.  What is this Texas Secretary of State UCC,
3  and, then, there's a number under your name?  What does
4  that mean?
5      A   Oh, I can't really tell you.  That is
6  Mr. Dunlap's doing.  Basically means that we're a secured
7  party credit.  It's a -- it's a status.  It's a legal
8  filing status.
9      Q   Is that part of that Sovereign Citizen movement?
10     A   I think it is.
11     Q   What is your -- what is your understanding of
12  that number?  Like, what does that number mean?
13     A   It is just my registered number.  It's a secured
14  party creditor.  That is the only thing I know about it.
15     Q   Okay.  And, then, underneath it says "U.C.C.
16  1-308 Jus soli (of the soil)."  What does that mean?
17     A   I don't know.
18         He was the one who put that together, and I let
19  him do it.
20     Q   Okay.  Well, then you may have the same answer,
21  but on this international immunity, and then there's a
22  long number.  What does that mean?
23     A   Yeah, I'm -- I'm a registered international
24  diplomat.
25     Q   Where are you registered?

236

```
 1
 2
 3
 4        I, the undersigned, a certified shorthand
 5   reporter of the State of California do hereby certify:
 6        That the foregoing proceedings were taken
 7   before me at the time and place herein set forth; that
 8   any witnesses in the foregoing proceedings, prior to
 9   testifying, were placed under oath; that a verbatim
10   record of the proceedings was made by me using machine
11   shorthand which was thereafter transcribed under my
12   directions; further, that the foregoing is an accurate
13   transcription thereof.
14        I further certify that I am neither
15   financially interested in the action nor a relative or
16   employee of any attorney of any of the parties.
17        IN WITNESS WHEREOF, I have this date
18   subscribed my name.
19
20   Dated:  August 17, 2020
21
22
23   _____
        Marcia S. Mc Entee,
24      CSR No. 13399
25
```

245



### U.S. Securities and Exchange Commission
### Prejudgment Interest Report

## Meta1/Dunlap

| Quarter Range | Annual Rate | Period Rate | Quarter Interest | Principal+Interest |
|---|---|---|---|---|
| **Violation Amount** | | | | **$10,849,776.47** |
| 04/01/2020-06/30/2020 | 5.00% | 1.24% | $134,881.10 | $10,984,657.57 |
| 07/01/2020-09/30/2020 | 3.00% | 0.75% | $82,835.12 | $11,067,492.69 |
| 10/01/2020-12/31/2020 | 3.00% | 0.75% | $83,459.78 | $11,150,952.47 |
| 01/01/2021-03/31/2021 | 3.00% | 0.74% | $82,486.50 | $11,233,438.97 |
| 04/01/2021-06/30/2021 | 3.00% | 0.75% | $84,019.97 | $11,317,458.94 |
| 07/01/2021-09/30/2021 | 3.00% | 0.76% | $85,578.59 | $11,403,037.53 |
| 10/01/2021-12/31/2021 | 3.00% | 0.76% | $86,225.71 | $11,489,263.24 |
| 01/01/2022-03/31/2022 | 3.00% | 0.74% | $84,989.07 | $11,574,252.31 |
| 04/01/2022-06/30/2022 | 4.00% | 1% | $115,425.42 | $11,689,677.73 |
| 07/01/2022-08/31/2022 | 5.00% | 0.85% | $99,282.19 | $11,788,959.92 |

| Prejudgment Violation Range | Quarter Interest Total | Prejudgment Total |
|---|---|---|
| **04/01/2020-08/31/2022** | **$939,183.45** | **$11,788,959.92** |

EXHIBIT

3



**U.S. Securities and Exchange Commission**
**Prejudgment Interest Report**

## Jointly and Severally between Meta1 and Dunlap

| Quarter Range | Annual Rate | Period Rate | Quarter Interest | Principal+Interest |
|---|---|---|---|---|
| **Violation Amount** | | | | **$3,370,916.78** |
| 04/01/2020-06/30/2020 | 5.00% | 1.24% | $41,906.21 | $3,412,822.99 |
| 07/01/2020-09/30/2020 | 3.00% | 0.75% | $25,736.04 | $3,438,559.03 |
| 10/01/2020-12/31/2020 | 3.00% | 0.75% | $25,930.12 | $3,464,489.15 |
| 01/01/2021-03/31/2021 | 3.00% | 0.74% | $25,627.73 | $3,490,116.88 |
| 04/01/2021-06/30/2021 | 3.00% | 0.75% | $26,104.16 | $3,516,221.04 |
| 07/01/2021-09/30/2021 | 3.00% | 0.76% | $26,588.41 | $3,542,809.45 |
| 10/01/2021-12/31/2021 | 3.00% | 0.76% | $26,789.46 | $3,569,598.91 |
| 01/01/2022-03/31/2022 | 3.00% | 0.74% | $26,405.25 | $3,596,004.16 |
| 04/01/2022-06/30/2022 | 4.00% | 1% | $35,861.52 | $3,631,865.68 |
| 07/01/2022-08/31/2022 | 5.00% | 0.85% | $30,845.98 | $3,662,711.66 |

| Prejudgment Violation Range | Quarter Interest Total | Prejudgment Total |
|---|---|---|
| **04/01/2020-08/31/2022** | **$291,794.88** | **$3,662,711.66** |



**U.S. Securities and Exchange Commission**
**Prejudgment Interest Report**

### Jointly and Severally between Meta1, Dunlap, and the Shamoon Relief Defendants

| Quarter Range | Annual Rate | Period Rate | Quarter Interest | Principal+Interest |
|---|---|---|---|---|
| **Violation Amount** | | | | **$5,938,180.21** |
| 04/01/2020-06/30/2020 | 5.00% | 1.24% | $73,821.64 | $6,012,001.85 |
| 07/01/2020-09/30/2020 | 3.00% | 0.75% | $45,336.41 | $6,057,338.26 |
| 10/01/2020-12/31/2020 | 3.00% | 0.75% | $45,678.29 | $6,103,016.55 |
| 01/01/2021-03/31/2021 | 3.00% | 0.74% | $45,145.60 | $6,148,162.15 |
| 04/01/2021-06/30/2021 | 3.00% | 0.75% | $45,984.88 | $6,194,147.03 |
| 07/01/2021-09/30/2021 | 3.00% | 0.76% | $46,837.93 | $6,240,984.96 |
| 10/01/2021-12/31/2021 | 3.00% | 0.76% | $47,192.11 | $6,288,177.07 |
| 01/01/2022-03/31/2022 | 3.00% | 0.74% | $46,515.28 | $6,334,692.35 |
| 04/01/2022-06/30/2022 | 4.00% | 1% | $63,173.37 | $6,397,865.72 |
| 07/01/2022-08/31/2022 | 5.00% | 0.85% | $54,338.04 | $6,452,203.76 |

| Prejudgment Violation Range | Quarter Interest Total | Prejudgment Total |
|---|---|---|
| **04/01/2020-08/31/2022** | **$514,023.55** | **$6,452,203.76** |



# U.S. Securities and Exchange Commission
## Prejudgment Interest Report

## Schmidt

| Quarter Range | Annual Rate | Period Rate | Quarter Interest | Principal+Interest |
|---|---|---|---|---|
| **Violation Amount** | | | | **$24,210.00** |
| 04/01/2020-06/30/2020 | 5.00% | 1.24% | $300.97 | $24,510.97 |
| 07/01/2020-09/30/2020 | 3.00% | 0.75% | $184.84 | $24,695.81 |
| 10/01/2020-12/31/2020 | 3.00% | 0.75% | $186.23 | $24,882.04 |
| 01/01/2021-03/31/2021 | 3.00% | 0.74% | $184.06 | $25,066.10 |
| 04/01/2021-06/30/2021 | 3.00% | 0.75% | $187.48 | $25,253.58 |
| 07/01/2021-09/30/2021 | 3.00% | 0.76% | $190.96 | $25,444.54 |
| 10/01/2021-12/31/2021 | 3.00% | 0.76% | $192.40 | $25,636.94 |
| 01/01/2022-03/31/2022 | 3.00% | 0.74% | $189.64 | $25,826.58 |
| 04/01/2022-06/30/2022 | 4.00% | 1% | $257.56 | $26,084.14 |
| 07/01/2022-08/31/2022 | 5.00% | 0.85% | $221.54 | $26,305.68 |

| Prejudgment Violation Range | Quarter Interest Total | Prejudgment Total |
|---|---|---|
| **04/01/2020-08/31/2022** | **$2,095.68** | **$26,305.68** |



## U.S. Securities and Exchange Commission
## Prejudgment Interest Report

### Jointly and Severally between Meta1, Dunlap, and Bowdler

| Quarter Range | Annual Rate | Period Rate | Quarter Interest | Principal+Interest |
|---|---|---|---|---|
| **Violation Amount** | | | | **$1,540,679.48** |
| 04/01/2020-06/30/2020 | 5.00% | 1.24% | $19,153.26 | $1,559,832.74 |
| 07/01/2020-09/30/2020 | 3.00% | 0.75% | $11,762.67 | $1,571,595.41 |
| 10/01/2020-12/31/2020 | 3.00% | 0.75% | $11,851.38 | $1,583,446.79 |
| 01/01/2021-03/31/2021 | 3.00% | 0.74% | $11,713.17 | $1,595,159.96 |
| 04/01/2021-06/30/2021 | 3.00% | 0.75% | $11,930.92 | $1,607,090.88 |
| 07/01/2021-09/30/2021 | 3.00% | 0.76% | $12,152.25 | $1,619,243.13 |
| 10/01/2021-12/31/2021 | 3.00% | 0.76% | $12,244.14 | $1,631,487.27 |
| 01/01/2022-03/31/2022 | 3.00% | 0.74% | $12,068.54 | $1,643,555.81 |
| 04/01/2022-06/30/2022 | 4.00% | 1% | $16,390.53 | $1,659,946.34 |
| 07/01/2022-08/31/2022 | 5.00% | 0.85% | $14,098.17 | $1,674,044.51 |

| Prejudgment Violation Range | Quarter Interest Total | Prejudgment Total |
|---|---|---|
| **04/01/2020-08/31/2022** | **$133,365.03** | **$1,674,044.51** |



**U.S. Securities and Exchange Commission**
**Prejudgment Interest Report**

## Warner Relief Defendants

| Quarter Range | Annual Rate | Period Rate | Quarter Interest | Principal+Interest |
|---|---|---|---|---|
| **Violation Amount** | | | | **$1,057,408.63** |
| 04/01/2020-06/30/2020 | 5.00% | 1.24% | $13,145.38 | $1,070,554.01 |
| 07/01/2020-09/30/2020 | 3.00% | 0.75% | $8,073.03 | $1,078,627.04 |
| 10/01/2020-12/31/2020 | 3.00% | 0.75% | $8,133.91 | $1,086,760.95 |
| 01/01/2021-03/31/2021 | 3.00% | 0.74% | $8,039.05 | $1,094,800.00 |
| 04/01/2021-06/30/2021 | 3.00% | 0.75% | $8,188.50 | $1,102,988.50 |
| 07/01/2021-09/30/2021 | 3.00% | 0.76% | $8,340.41 | $1,111,328.91 |
| 10/01/2021-12/31/2021 | 3.00% | 0.76% | $8,403.47 | $1,119,732.38 |
| 01/01/2022-03/31/2022 | 3.00% | 0.74% | $8,282.95 | $1,128,015.33 |
| 04/01/2022-06/30/2022 | 4.00% | 1% | $11,249.25 | $1,139,264.58 |
| 07/01/2022-08/31/2022 | 5.00% | 0.85% | $9,675.95 | $1,148,940.53 |

| Prejudgment Violation Range | Quarter Interest Total | Prejudgment Total |
|---|---|---|
| **04/01/2020-08/31/2022** | **$91,531.90** | **$1,148,940.53** |



EXHIBIT

4

# META 1 Coin -
# Holds Strong Amid Market Blood Bath!

Both the Crypto Market and the Stock Market are in **FREE FALL**, Wiping out **Billions** as they go down.

**Meta 1 coin has not gone down at all, in fact it has Increased in all of this chaos!**

Meta 1 was designed to be the **First Appreciating Stable Coin** regardless of the whims of the market.
Everyone can clearly see, **META 1 Performance is Holding STRONG.**

**Justin-** **META 1's Chief Operating Officer** has a short video below explaining all of this. His insight and understanding of the crypto space will make it easy for you to understand what is taking place, and show you why **NOW, is the right time to jump in to META 1!**

**"See how cleverly orchestrated Crypto 'financial modeling & design' can help you secure your holdings".**



.META 1 Coin - COO Justin

When you're ready to join META 1, or you're an existing member
wanting to place another order, we would love to help you get started!

**Buy META 1 Now**

**Contact Us to Order**





 

  

Home    My Network    Jobs





# META 1 Coin

META 1 is a Private Digital Currency backed by humanity's greatest assets. We provide the liquidity of gold.

International Trade and Development · Sedona, Arizona · 146 followers

**See all 7 employees on LinkedIn**

[ + Follow ]    [ Learn more ⤤ ]    [ More ]

---

Home    **About**    Posts    Jobs    People    Videos

---

## Overview

META 1 Coin is an asset-backed "Smart" Private Digital Currency secured by Humanity's greatest assets. Such as gold, in ground assets and advanced intellectul property. META 1 Coin is a coin for Humanity, built on the framework of abundance. This currency is designed to track the value of the META 1 gold portfolio using Smart Contracts. Smart Contracts are unbreachable
contracts on the blockchain and are designed to ensure appreciation, never devaluation. META 1 Coin has a Private Bank and Private Exchange allowing unencumbered transactions as well as superior liquidity and security.

**Website**
http://www.meta1.io

**Phone**
928-494-0976

**Industry**
International Trade and Development

**Company size**

EXHIBIT

5

 


Home


My Network


Jobs

**Headquarters**
Sedona, Arizona

**Founded**
2018

**Specialties**
Private Bank, Private Exchange, Private Digital Currency, Blockchain, Gold Standard, and Asset Management

## Locations (1)

Primary

2370 W State Route 89A, Suite 11-117, Sedona, Arizona 86336, US

**Get directions** 🔗



    

Home    My Network    Jobs



# Nicole M. · 3rd

Global Visionary at META 1 Coin

-  META 1 Coin

Sedona, Arizona, United States · **Contact info**

**173** connections

🔒 **Message**    More

## About

Technical sales and relations within the market place. Team lead educator for Business Development and strategic launch within the Private Digital Currency space. Currently working on exchange fluidity and market placement. Client liaison and global ambassador for META 1 Coin.

## Featured



Link

**METANOMICS**
YouTube

Link

**META 1 Coin White Paper Explained**
YouTube

Image

 

  
Home    My Network    Jobs

abundance and equity for | Coin White Paper describes | Meta1
Humanity. It is a financial | in detail the inner workings | Welco
platform using Blockchain | of our coin and the…

## Activity
172 followers

### Nicole hasn't posted lately
Nicole's recent posts and comments will be displayed here.

Show all activity →

## Experience



### META 1 Coin
4 yrs 9 mos

**Director Of Business Development**
Mar 2018 - Present · 4 yrs 7 mos
Sedona, Arizona

Strategically placing assets in the private digital currency market.
Relationships include Gold, In Ground Assets, International Trusts,
Trading Platforms, International Exchanges and more. We
endeavor to bring META 1 to humanity, offering a chance to build
their personal portfolio. When you invest with META 1 coins, you
are buying a piece of our current assets, that you will own and can
trade on the private digital currency market.



**META 1**
Welcome Home!

**Asset Management Specialist**
2018 - Present · 4 yrs 9 mos

Developing relationships within the Fine Art community to ensure
stability within our coin. We are merging science, art &  …see more

## Interests

**Influencers**    Companies



### Nicole Bowdler

**Trustee and Art Acquisitions & Forensics
Director of Business Development**

**Nicole Bowdler Linked In**



Nicole has spent the last thirteen years in business development, marketing, and philanthropic start-ups. Her resources and skill set have allowed her to access human consciousness and understand the market entirely. She has worked in multiple industries to enhance old financial business models and to incorporate new resources including media, advertisement, and public relations. Her ability to bring the most significant impact in the quickest time, allows her to use intuitive insight and skills. Her skills include: expanding revenues with business partnerships and developing marketing trends. Nicole loves to match the global economy with the next big deal for Humanity.

## Sales and Operations -



### Wanda Ironheart Traversie
**Senior Director of Operations & Board Member**

Wanda Ironheart is the Director of Operations, our first board member of META 1 Coin and one of the founders. She is the sole proprietor of A-1 Dependable Insurance since 2004 and has extensive knowledge in the insurance field. Wanda Ironheart is a Shamanic healer and teaches classes on the benefits of energy and conscious living at Ironheart Energy Healing. She is a multi-dimensional psychic that has learned the art of using her sharp intuition on everyday dealings to co-create the highest integrity life in business and her shamanic practice. Wanda Ironheart is also an enrolled member of the Cheyenne River Sioux Tribe, a federally recognized tribe in South Dakota.

White Paper FINAL 4.29.19