FILED
March 15, 2023
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: \_\_\_\_Julie Golden\_\_\_\_
DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § |
| Plaintiff, | § |
| v. | § |
| **META 1 COIN TRUST,** | § |
| **ROBERT P. DUNLAP, individually and d/b/a** | § Civil Action No.: 1:20-cv-273-RP |
| **CLEAR INTERNATIONAL TRUST,** | § |
| **NICOLE BOWDLER, and DAVID A. SCHMIDT,** | § |
| Defendants, | § |
| and | § |
| **PRAMANA CAPITAL, INC.,** | § |
| **PETER K. SHAMOUN a/k/a PETER K. SHAMOON,** | § |
| **WANDA IRONHEART TRAVERSIE-WARNER,** | § |
| **ALFRED DEWITT WARNER JR., and** | § |
| **IRONHEART TRUST,** | § |
| Relief Defendants. | § |

## ORDER

Following the entry of an Agreed Partial Judgment against Defendant David A. Schmidt ("Schmidt") [Doc. 101] and the Order granting Plaintiff's Motion for Default Judgment as to certain parties ("Default Order") [Doc. 114], Plaintiff Securities and Exchange Commission ("Commission") filed a Motion for Monetary Remedies and Brief in Support, and Motion for Entry of Final Judgment as to: (1) Defendants Meta 1 Coin Trust ("Meta1"), Robert P. Dunlap, individually and d/b/a Clear International Trust ("Dunlap"), and Nicole Bowdler ("Bowdler") (together, "the Defaulting Defendants"); (2) Schmidt (collectively, with the Defaulting Defendants "Defendants"); and (3) Relief Defendants Wanda Ironheart Traversie-Warner ("Traversie"), Alfred Warner ("Warner"), Ironheart Trust ("Ironheart") (together, the "Warner

Relief Defendants") ("Motion"). Based on all the files, records, and proceedings herein, the Court is of the opinion that the Motion should be GRANTED. By separate document, the Court will issue final judgments against all parties, incorporating the terms of the Agreed Partial Judgment and the Default Order.

THEREFORE, pursuant to FED. R. CIV. P. 52(a), the Court enters the Findings of Fact and Conclusions of Law set forth below relating to monetary remedies.

## **FINDINGS OF FACT**

1. From April 2018 through the present, working in collaboration with each other, the Defendants raised over $15.2 million from at least 800 investors in 40 states and eight foreign countries in a fraudulent and unregistered securities offering in the form of bogus crypto assets they called the "Meta1 Coin." Defendants enticed investors with the allure of a cryptocurrency, but the securities offering is nothing but a vehicle to steal investors' money.

2. Defendants have stated that: (a) investors were, in fact, purchasing asset-backed digital coins; (b) Meta1 owned $1 billion in art insured against loss by a surety bond, and later, that Meta1 owned $2 billion [and now $8.8 billion] in gold assets; (c) KPMG, one of the largest independent financial audit firms in the world, was auditing Meta1's gold assets; (d) Meta1 formed its own investment bank and developed its own digital currency exchange; (e) the Coin is safe and risk-free and will never lose value; (f) an initial public offering of the Coin ("ICO") on its own exchange was imminent; and (g) each Coin, sold for either $22.22 or $44.44 would in two years be worth $50,000—up to a 224,923% return—as a "very conservative value." All of those statements are false.

3. Each of the Defendants acted with a high degree of scienter.

4. Accounting for returns to investors, the total amount of ill-gotten gains or net profits realized among the parties is $13,451,212.89. Because Meta1 is wholly a fraudulent

operation and illegal scheme orchestrated by the Defendants, there are no legitimate business expenses to be deducted from the total amount of net profits.

5. Investor money was not used for the stated purpose of the investment. Instead, investor money was distributed to Meta1-related individuals, used to pay bills (such as credit card and loan payments), and used to pay personal expenses and costs associated with marketing the fraud scheme.

6. Dunlap continues to operate the Meta1 scheme through various Meta1 associates. From the start of the scheme through March 16, 2020, when the Court entered its temporary restraining order and imposed an asset freeze [Doc. 8] (the "Initial TRO"), a significant portion of the Meta1 investor proceeds were sent or deposited into accounts controlled by Pramana Capital, Inc. and Peter K. Shamoun a/k/a Peter K. Shamoon (the "Shamoon Relief Defendants").

7. After the Court froze Shamoon's accounts, Meta1 investor funds were directed to accounts controlled by the Warner Relief Defendants. After the Court froze the Warner Relief Defendants' accounts, Meta1 investor funds were directed to accounts controlled by Meta1 board member Richard Grassie. Grassie continued a pattern established by Meta1 and Dunlap: open and use a bank account for a short period of time, deposit investor funds, spend investor funds on purposes not disclosed to investors, including the withdrawing of investor funds using cashier's checks to pay other related third parties, and then open a new bank account at a different bank to repeat the process again.

8. Dunlap directed or caused Meta1 to transfer the proceeds of Defendants' fraud to entities he controlled and persons acting in concert with him, including Bowdler in the amount of $1,540,679.48 (representing her net profit), and the Shamoon Relief Defendants in the amount of $7,457,998. Of the amount transferred to the Shamoon Relief Defendants, $5,938,180.21 has not been turned over to the Commission for distribution to victims. Further, Dunlap funneled the

proceeds of the Defendants' fraud to the Warner Relief Defendants in the amount of $1,057,408.63. None of the Warner Relief Defendants has a legitimate claim to these funds, which represent investor funds gained by the Defendants through fraud.

9. Schmidt's net profit is at least $24,210.

10. The Commission seeks to recover disgorgement so that it may return those funds to investors who lost significant sums of money when they invested money in the fraudulent scheme.

11. The conduct of each of the Defendants involved fraud, deceit, manipulation, or deliberate disregard of a regulatory requirement and directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.

## CONCLUSIONS OF LAW

1. The Commission is authorized to seek, and the Court is authorized to order, disgorgement that does not exceed a wrongdoer's net profits and is awarded for victims. The district court has broad discretion in calculating the amount to be disgorged. Disgorgement need only be a reasonable approximation of profits causally connected to the violation.

2. In determining an approximate amount of ill-gotten profits, the risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty. Doubts are to be resolved against the defrauding party.

3. An order for disgorgement and pre-judgment interest against each Defendant is proper because each Defendant violated the federal securities laws.

4. The court may order equitable relief against a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds. This Court has the equitable power to order the Relief Defendants to disgorge all proceeds of fraud they received to prevent them from being unjustly enriched through the Defendants' wrongdoing.

5. Courts have flexibility to impose joint and several liability against individuals or partners engaged in concerted wrongdoing.

6. An award of pre-judgment interest in a case involving violations of the federal securities laws rests within the equitable discretion of the district court to be exercised according to considerations of fairness.  Where a securities law violator has enjoyed access to funds over a period of time as a result of his or her wrongdoing, requiring the wrongdoer to pay prejudgment interest is consistent with the equitable purpose of the remedy of disgorgement.

7. The IRS underpayment of federal income tax rate as set forth in 26 U.S.C. § 6621(a)(2) is appropriate for calculating prejudgment interest in SEC enforcement actions such as this one.  That rate of interest reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud.

8. The Securities Act and the Exchange Act both authorize courts to impose civil penalties, and establish an escalating, three-tier structure for securities violations depending upon the egregiousness of the defendant's conduct and the losses (or risk of losses) to investors.  15 U.S.C. §77t(d); 15 U.S.C. §78u(d)(3), and 17 C.F.R. 201.1001 (increasing statutory amounts to reflect inflation).  These penalties are designed to punish individual violators and deter future violations of the securities laws, which is necessary because, without civil penalties, the only financial risk to violators is the forfeiture of their ill-gotten gains.

9. The Commission has established that the Defendants' violations involved fraud and deceit and resulted in substantial losses of over $13.4 million to investors.  Each of the Defendants is therefore subject to a third-tier penalty.  The amount of civil penalties to assess within the permissible statutory range is left to the Court's discretion.

10. Under these statutes, the Court may impose a civil penalty against a defendant not exceeding the greater of $207,183 for a natural person or $1,035,909 for any other person per violation or the gross amount of pecuniary gain to such defendant as a result of the violation. Because each of the Defaulting Defendant's gross pecuniary gain far exceeds the maximum statutory amount, those amounts are the maximum penalty that the Court may impose.

11. In determining the appropriate penalty, the Court considers: (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; (5) whether the defendant has admitted wrongdoing; and (6) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

12. The following monetary relief is appropriate in this case:

| Party | Disgorgement | PJI | Penalty | Total |
|---|---|---|---|---|
| **Meta1** and **Dunlap,** jointly and severally | $10,849,776.47 | $939,183.45 | $10,849,776.47 | $22,638,736.39 |
| Of that total disgorgement: | | | | |
|    **Meta1** and **Dunlap,** jointly and severally | $3,370,916.78 | $291,794.87 | | |
|    **Meta1/Dunlap,** jointly and severally with Shamoon Relief Defendants | $5,938,180.21 | $514,023.55 | | |
|    Meta1/Dunlap jointly and severally with **Bowdler** | $1,540,679.48 | $133,365.03 | | |
| **Bowdler,** jointly and severally with Meta1/Dunlap | $1,540,679.48 | $133,365.03 | $1,540,679.48 (individual penalty) | $3,214,723.99 |
| **Schmidt** | $24,210.00 | $2,095.68 | $24,210.00 | $50,515.68 |
| **Warner Relief Defendants,** jointly and severally | $1,057,408.63 | $91,531.90 | N/A | $1,148,940.53 |

SO ORDERED this <u>15th</u> day of <u>March</u>, 2023.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE